883 F.2d 245
 58 USLW 2139, 20 Envtl. L. Rep. 20,017
 SWIN RESOURCE SYSTEMS, INC., Appellant,
v.
LYCOMING COUNTY, PENNSYLVANIA, Acting Through the LYCOMING
COUNTY SOLID WASTE DEPARTMENT; Wilt, Dolly M.; and Smith,
Gene; and Morningstar, Lora P., all in their respective
official capacities as Commissioners of Lycoming County,
Pennsylvania and in each of their individual capacities;
and Alexander, Wayne I., in his official capacity as General
Manager of Solid Waste Facilities of the Lycoming County
Solid Waste Department and in his individual capacity, Appellees.
 No. 88-5500.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 31, 1988.
Decided Aug. 25, 1989.
Rehearing and Rehearing In Banc Denied Sept., 1989.
 
 John P. Krill, Jr. (argued), Carleton O. Strouss, Kirkpatrick & Lockhart, Harrisburg, Pa., Richard A. Gahr, Gahr & Sholder, Williamsport, Pa., for appellant.
 J. David Smith (argued), Paul J. Ryan, McCormick, Reeder, Nichols, Sarno, Bahl & Knecht, Williamsport, Pa., for appellees.
 Before GIBBONS, Chief Judge, and BECKER and WEIS, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 Plaintiff-appellant Swin Resource Systems, Inc. ("Swin") owns and operates a solid waste processing facility in Hemlock Township, Columbia County, Pennsylvania. Defendant-appellee Lycoming County ("Lycoming"), a Pennsylvania county, operates a landfill in Brady Township, in Lycoming. The case at bar arises from Lycoming's decision to charge a lower rate for the reception and disposal of waste generated within Lycoming and nearby counties than for waste generated outside that area. In its complaint filed in the Middle District of Pennsylvania, Swin contended that this price difference violated the commerce clause by impermissibly interfering with and discriminating against interstate commerce, denied Swin equal protection of the laws and due process of law, violated a federal land leasing statute (43 U.S.C. Sec. 931c (1982)), and constituted a breach of contract. Named as defendants were Lycoming and various county officials.
 
 
 2
 The defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). With respect to the commerce clause claim, the defendants asserted that the marketing practices of the county-operated landfill fall within the protection of the so-called market-participant doctrine and hence escape scrutiny under the commerce clause. With respect to the equal protection claim, the defendants asserted that Lycoming's pricing scheme was rationally related to the legitimate purpose of presuming landfill capacity for local waste. With respect to the federal statutory claim, the defendants contended that the statute did not give rise to a private right of action.
 
 
 3
 The district court, in an opinion reported at 678 F.Supp. 1116 (M.D.Pa 1988), agreed with the position of defendants and held that Swin's federal claims (both constitutional and statutory) failed to state a claim upon which relief can be granted. It therefore dismissed these claims pursuant to Fed.R.Civ.P. 12(b)(6). It also dismissed the pendent state breach of contract claim for want of jurisdiction. Swin then filed a motion under Fed.R.Civ.P. 59(e) to alter or amend the judgment and an alternative motion under Fed.R.Civ.P. 62(c) for an injunction pending appeal. Swin did not seek leave by this motion or otherwise to amend its complaint in order to present additional facts or theories in support of its claims. Swin did, however, attach to its motion papers a deposition of a county employee associated with the initiation and operation of the landfill supplying additional factual data.
 
 
 4
 The district court denied Swin's motions, and Swin appealed from the district court's order refusing to alter or amend the judgment. A timely appeal from a denial of a Rule 59 motion to alter or amend the judgment also " 'brings up the underlying judgment for review.' " Federal Kemper Insurance Co. v. Rauscher, 807 F.2d 345, 348 (3d Cir.1986) (citation omitted).
 
 
 5
 In deciding (and reviewing) a motion to dismiss for failure to state a claim upon which relief can be granted, a court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom. The complaint may be dismissed "only if it is certain that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). Facts contained in the deposition that Swin submitted must not be considered if they fall outside the ambit of the complaint. See Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978). We will consider the facts stated in the deposition, to the extent that they fall within the ambit of the complaint, as illustrative of those facts which Swin could prove if its complaint were reinstated.
 
 
 6
 On appeal Swin has abandoned its due process and pendent state claims. We are therefore faced with three questions: (1) whether the marketing practices of the county-operated landfill fall within the market participant doctrine and hence escape scrutiny under the commerce clause; (2) whether these marketing practices violate the equal protection clause; and (3) whether the federal land leasing statute creates a private right of action in Swin's favor. For the reasons that follow, we will affirm.
 
 I. THE PLEADED FACTS
 A. Swin's Complaint
 
 7
 On June 5, 1973, the United States Bureau of Prisons granted a thirty-year permit to Lycoming to operate a public landfill on a 130-acre parcel on the federal prison reservation in Allenwood, Pennsylvania. The permit required Lycoming to pay all expenses associated with operating the landfill and to dispose of certain Bureau of Prisons waste without charge. In May 1974, Lycoming applied for and subsequently received a grant from the Appalachian Regional Commission in connection with the construction and operation of the landfill. The county opened the landfill in 1978 and has continued to operate it since that time through the Lycoming County Solid Waste Department.
 
 
 8
 Swin's waste processing facility receives solid waste from Eastern Pennsylvania and New Jersey. Swin recycles some of the waste and sells it to businesses in several states. The remaining waste is compacted into bales and transported to landfills for disposal. Swin can produce 30 tons per hour of this baled solid waste and is presently producing an average of 300 tons per day.
 
 
 9
 On March 6, 1986, Lycoming notified Swin by letter that it would accept Swin's baled solid waste for a price in the "range of" $10 per ton, promising to give Swin the exact price after the completion of a waste study within the next month. The letter also indicated that higher rates applied to waste generated outside an area comprised of Lycoming, Union, Snyder, Northumberland, and Montour Counties and part of Columbia County, the other five counties being in the vicinity of Lycoming. Lycoming had apparently regarded Swin's baled waste as originating from within the 5 1/2-county area, since from November 1986 to January 1987 it accepted Swin's baled waste at the reduced rate. The landfill has sufficient capacity to serve the needs of both the 5 1/2-county area and Swin during the term of the thirty-year Bureau of Prisons lease.
 
 
 10
 Beginning in January 1987, however, and continuing until September 14, 1987, Lycoming charged Swin $10 per ton for waste generated within Lycoming, $13.25 per ton for waste generated within the remaining counties of the 5 1/2-county area, and $17.20 per ton (less $1.50 for unloading) for waste generated outside the 5 1/2-county area. In March 1987, Lycoming instructed Swin to reduce the volume of waste it delivered to the landfill until a new field was "on line." Swin accordingly reduced its deliveries to 100 tons per day. Because of this volume limitation, Swin was compelled to scale back its business operations substantially, as other waste disposal sites were scarce, more distant, and more costly.
 
 
 11
 Effective September 14, 1987, Lycoming raised the rate for solid waste originating outside the 5 1/2-county area to $30 per ton. Lycoming did not raise the $10 and $13.25 per ton rates for waste originating within the 5 1/2-county area. Lycoming charged Swin the $30 per ton rate and limited Swin indefinitely to delivering 100 tons per day. Under these conditions, Swin cannot economically use the Lycoming landfill, and it is no longer hauling waste there.
 
 
 12
 B. The Deposition Attached to Swin's Post-Judgment Motions
 
 
 13
 Swin submitted the deposition of Jerry Walls, the longtime Executive Director of the Lycoming County Planning Commission, the functions of which include planning how Lycoming residents are to dispose of their solid waste. According to the deposition, Lycoming received $1.3 million from the Appalachian Regional Commission to assist Lycoming in the construction of the landfill.
 
 
 14
 Walls describes the recycling system Lycoming has implemented to reduce the waste flow into the landfill. He testified that there were approximately nine to ten years of capacity left in the landfill. In addition, Walls describes the steps Lycoming took to ensure that enough municipalities used its landfill to enable Lycoming to pay back the landfill's long-term indebtedness with user revenues. The Planning Commission developed a model municipal ordinance (subsequently adopted by a number of Lycoming municipalities) that permitted Lycoming to designate the landfill (or transfer station) to which a municipality's waste haulers brought the waste they collected. Lycoming also entered into long-term disposal contracts with a number of municipalities.
 
 II. THE COMMERCE CLAUSE CLAIM
 
 15
 The commerce clause grants Congress the power "[t]o regulate Commerce ... among the several States...." U.S. Const. Art. I, Sec. 8, cl. 3. The Supreme Court, however, has long interpreted the clause to prohibit states from taking certain actions respecting interstate commerce even absent congressional action. See, e.g., Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 319 (1852). The commerce clause has been so construed in order to preserve "our national solidarity" by preventing the "rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation," Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 522-23, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935); to promote "[t]he material success that has come to inhabitants of the states which make up this federal free trade unit," H.P. Hood & Sons, Inc. v. DuMond, 336 U.S. 525, 538, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949); and in recognition that "when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state," South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 185 n. 2, 58 S.Ct. 510, 513 n. 2, 82 L.Ed. 734 (1938).
 
 A. The Market Participant Doctrine
 
 16
 Swin contends that Lycoming's attempt to preserve its landfill's capacity for local residents by charging a higher price to dispose of distant waste in the landfill (and limiting the volume of distant waste accepted by the landfill) constitutes an impermissible interference with and discrimination against interstate commerce in violation of the commerce clause. The district court granted the defendants' motion to dismiss the commerce clause claim on the ground that Lycoming had acted as a "market participant." Under the market participant doctrine, a state or state subdivision that acts as a market participant rather than a market regulator "is not subject to the restraints of the Commerce Clause." White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 208, 103 S.Ct. 1042, 1045, 75 L.Ed.2d 1 (1983).
 
 
 17
 Application of the distinction between "market participant" and "market regulator" has, however, occasioned considerable dispute in the Supreme Court's jurisprudence. The author of each of the three opinions that applied the doctrine--Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (Powell, J.); Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (Blackmun, J.); White, 460 U.S. 204, 103 S.Ct. 1042 (Rehnquist, J.)--authored a dissent in the next, the pattern being maintained by Justice Rehnquist's dissent in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 101, 104 S.Ct. 2237, 2247-48, 81 L.Ed.2d 71 (1984), the principal case in which application of the doctrine resulted in a conclusion that the state was not a market participant. The Court has expressly reserved the question whether state operation of a landfill may fall within the market participant doctrine. See City of Philadelphia v. New Jersey, 437 U.S. 617, 627 n. 6, 98 S.Ct. 2531, n. 6, 57 L.Ed.2d 475 (1978).
 
 
 18
 For the reasons explained below, we hold that Lycoming County acted as a market participant rather than a market regulator in deciding the conditions under which Swin could use its landfill. It is useful to begin our analysis with a review of the four principal market participant cases.
 
 
 19
 In Alexandria Scrap, the Supreme Court upheld Maryland's statutory scheme to rid the state of derelict automobiles, even though the scheme entailed two types of discrimination: (1) Maryland paid bounties to in-state scrap auto hulk processors while refusing to pay bounties to out-of-state processors on the same terms, and (2) Maryland paid bounties only for vehicles formerly titled in Maryland. 426 U.S. at 797, 801, 96 S.Ct. at 2493-94. The Court held that the statutory scheme was consistent with the commerce clause on the ground that Maryland was participating in the market rather than regulating it. Id. at 809-10, 96 S.Ct. at 2497-98. As the majority put it, "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." Id. at 810, 96 S.Ct. at 2498 (footnotes omitted).
 
 
 20
 In Reeves, the Court upheld a South Dakota policy of confining the sale of cement by a state-operated cement plant to residents of South Dakota in order to meet their demand during a " 'serious cement shortage.' " 447 U.S. at 432, 100 S.Ct. at 2275. The Court affirmed "[t]he basic distinction drawn in Alexandria Scrap between States as market participants and States as market regulators" and concluded that "South Dakota, as a seller of cement, unquestionably fits the 'market participant' label." Id. at 436, 440, 100 S.Ct. at 2277, 2279. The Court upheld the South Dakota policy even though Reeves, a Wyoming corporation that had purchased about 95% of its cement from South Dakota's state-operated plant for over twenty years, was forced to cut production by over 75% as a result of the policy. Id. at 433, 452 n. 4, 100 S.Ct. at 2286 n. 4.
 
 
 21
 In White, the Court, deeming the case "well within the scope of Alexandria Scrap and Reeves," upheld an executive order of the Mayor of Boston requiring all construction projects funded in whole or in part either by city funds or city-administered federal funds to be performed by a work force of at least 50% city residents. 460 U.S. at 211 n. 7, 205 n. 1, 103 S.Ct. at 1046 n. 7, 1043 n. 1. Justice Blackmun's dissent emphasized that the city "ha[d] imposed as a condition of obtaining a public construction contract the requirement that private firms hire only Boston residents for 50% of specified jobs," hence regulating whom private employers might hire. Id. at 217, 103 S.Ct. at 1049-50. Although the majority agreed that for the action to fall within the market participant doctrine there must be "some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business," it found it "unnecessary ... to define those limits with precision" as "[i]n this case ... [e]veryone affected by the order is, in a substantial if informal sense, 'working for the city.' " Id. at 211 n. 7, 103 S.Ct. at 1046 n. 7.
 
 
 22
 In Wunnicke, however, a plurality struck down Alaska's requirement that timber taken from state lands be processed in-state prior to export. Adhering to the distinction suggested in White, the plurality held that "[t]he limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but [does not] allow[ ] it to ... impose conditions, whether by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market." 467 U.S. at 97, 104 S.Ct. at 2245. The Alaska policy crossed the line distinguishing participation from regulation because the conditions it attached to its timber sales amounted to "downstream regulation of the timber-processing market in which it is not a participant." Id. at 99, 104 S.Ct. at 2246.
 
 
 23
 Application of the teaching of these four cases, with one caveat discussed below, readily leads us to the conclusion that Lycoming County's marketing of its landfill constitutes market participation rather than regulation. We see Lycoming as a market participant in the market for disposal services: the discrimination to which Swin objects is embodied only in rules concerning the price and volume conditions under which persons may use the disposal service that Lycoming itself offers. In setting these price and volume conditions, Lycoming has not crossed the line that Alaska crossed when that state attempted to regulate the timber-processing market by conditioning its timber sales on guarantees that the purchasers would act in a certain way in a downstream market. The price and volume conditions to which Swin objects do not pertain to the operation of private landfills and do not apply beyond the immediate market in which Lycoming transacts business.
 
 
 24
 If Maryland may decree that only those with Maryland auto hulks will receive state bounties, it would seem that Lycoming can similarly decree that only local trash will be disposed of in its landfill on favorable terms. If South Dakota may give preference to local concrete buyers when a severe shortage makes that resource scarce, it would seem that Lycoming may similarly give preference to local garbage (and hence local garbage-producing residents) when a shortage of disposal sites makes landfills scarce.[1] And if Boston may limit jobs to local residents, we see no reason why Lycoming may not limit preferential use of its landfill to local garbage (and hence local garbage-producing residents).
 
 
 25
 Swin argues that Lycoming cannot be a market participant because the landfill is on federal government land and its start-up costs were paid for, in part, with federal funds. But the identity of Lycoming's lessor is irrelevant, and a federal subsidy cannot distinguish Lycoming's preference for local garbage from Boston's hiring preference for jobs on construction projects funded by city-administered federal grant money.
 
 
 26
 Judge Gibbons states that "[t]here is no principled way to distinguish" the case at bar from Wunnicke because Lycoming's restrictions on what garbage may be dumped in its landfill "affects" the "patterns of trade between concerns like Swin and its waste suppliers in New Jersey." Diss. Op. at 259. With respect, Judge Gibbons reads Wunnicke too broadly. It does not hold that local governments will not be deemed market participants merely because of some incidental effect on trade. In Wunnicke, the state's conditions on sales of state timber, by their own terms, set down rules as to what may be done with the timber with respect to activities quite distinct from the market transactions in which the state was engaged; in the case at bar, by contrast, Lycoming's conditions on what garbage may be dumped in its landfill do not, by their own terms, regulate what may be done with the garbage outside of the market transactions in which Lycoming is engaged.
 
 
 27
 No court, to our knowledge, has ever suggested that the commerce clause requires city-operated garbage trucks to cross state lines in order to pick up the garbage generated by residents of other states. If a city may constitutionally limit its trucks to collecting garbage generated by city residents, we see no constitutional reason why a city cannot also limit a city-operated dump to garbage generated by city residents.[2] With respect to municipal garbage trucks and municipal garbage dumps, application of the market participant doctrine enables " 'the people [acting through their local government] to determine as conditions demand ... what services and functions the public welfare requires.' " Reeves, 447 U.S. at 438 n. 11, 100 S.Ct. at 2278 n. 11 (quoting Helvering v. Gerhardt, 304 U.S. 405, 427, 58 S.Ct. 969, 978-79, 82 L.Ed. 1427 (1938) (Black, J., concurring)). The residents who reside within the jurisdiction of a county or municipality are unlikely to pay for local government services if they must bear the cost but the entire nation may receive the benefit.
 
 
 28
 Judge Gibbons reads Wunnicke as "suggesting that the limit of the market participant exception must at least be the 'narrowly defined' market in which the state participates." Diss. Op. at 258. That test is met here. As we have already intimated, the distinction between market participant and market regulator is problematic, and Judge Gibbons' arguments with respect to the difficulties of the market participant doctrine are not without force. We are satisfied, however, that within the existing Supreme Court cases, Lycoming clearly falls on the market participant side of the line.
 
 
 29
 B. Does a "Natural Resource" Exception Apply Here?
 
 
 30
 Swin's vigorous argument that Lycoming has attempted to harbor a scarce natural resource for its own residents brings us to the potential caveat we mentioned. While the harboring of a scarce manufactured product or human service does not preclude the invocation of the market participant doctrine because it is scarce (in Reeves the Supreme Court applied the doctrine to South Dakota's effort to harbor cement for its own residents despite a serious cement shortage), it may be that there is some special rule to be applied to a state's effort to harbor a scarce natural resource. Unlike a manufactured product or the provision of a human service, a state does not have the ability to develop a natural resource if it has not had the fortuity to be favored with such a resource. While it may seem fair for South Dakota to favor its citizens in the sale of cement from a state-owned cement plant, for a state to favor its own citizens in selling rights to mine coal or limestone on state-owned lands, for example, or in selling state-owned coal or limestone, would seem less fair, especially if the state happened to be endowed with the bulk of our nation's coal or limestone reserves and the other states were dependent upon it.
 
 
 31
 The Supreme Court has not squarely faced this issue, although it has noted its concern that a state's endowment with a natural resource is a product of happenstance rather than hard work. In Reeves, the cement case, the Court noted that
 
 
 32
 [c]ement is not a natural resource, like coal, timber, wild game, or minerals. It is the end product of a complex process whereby a costly physical plant and human labor act on raw materials. South Dakota has not sought to limit access to the State's limestone or other materials used to make cement.... Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement. Whatever limits might exist on a State's ability to invoke the Alexandria Scrap exemption to hoard resources which by happenstance are found there, those limits do not apply here.
 
 
 33
 447 U.S. at 443-44, 100 S.Ct. at 2281 (emphasis added; citations and footnotes omitted).
 
 
 34
 Similarly, in Sporhase v. Nebraska, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), a case which upheld against a commerce clause challenge much of Nebraska's scheme to control the sale of groundwater, the Court, citing Reeves, stated that "given [Nebraska's water] conservation efforts, the continuing availability of ground water in Nebraska is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage." 458 U.S. at 957, 102 S.Ct. at 3464-65 (emphasis added). And in Wunnicke, the Alaska downstream timber regulation case, the Court noted in passing that an "element[ ] ... not present in Reeves " but present in the Alaska case was the "involve[ment]" of a "natural resource." 467 U.S. at 96, 104 S.Ct. at 2245. Cf. New England Power Co. v. New Hampshire, 455 U.S. 331, 338 n. 6, 102 S.Ct. 1096, 1100 n. 6, 71 L.Ed.2d 188 (1982) (characterizing Reeves as establishing that "a state may confine to its residents the sale of products it produces " and refusing to characterize as market participation New Hampshire's efforts to limit out-of-state sale of hydroelectric power generated by a privately owned power company from a river assertedly owned by the state).
 
 
 35
 Interpreting the Supreme Court's passing remarks as to the possible inapplicability of the market participant doctrine in a natural resource case is no easy task. The purported basis of the market participant doctrine is that " '[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others.' " White, 460 U.S. at 207, 103 S.Ct. at 1044 (quoting Alexandria Scrap, 426 U.S. at 810, 96 S.Ct. at 2498 (footnotes omitted)). The Court in Reeves also quoted this sentence, emphasizing its "unmistakably broad terms." 447 U.S. at 436, 100 S.Ct. at 2277. Hence, despite the Supreme Court's dicta, excepting natural resources from the reach of the doctrine is inconsistent with the doctrine's theoretical foundation, as a state selling a natural resource is "participating in the market."
 
 
 36
 Whether there is a natural resource exception to the market participant doctrine is a difficult question, but, fortunately, one which we need not answer at this level of abstraction. First, land, the natural resource at issue here, cannot be used for a landfill without the expenditure of at least some money to prepare it for that purpose. The Lycoming landfill is therefore "not simply happenstance," Sporhase, 458 U.S. at 957, 102 S.Ct. at 3464, but is at least to some extent like South Dakota's cement plant in that government funds were needed to construct it. Moreover, since the land upon which the landfill was constructed had to be leased in this case, the land, even prior to development, bore some resemblance to South Dakota's cement plant in that its devotion to public use required the disbursement or promise of future disbursement of government resources. Cf. Sporhase, 458 U.S. at 957, 102 S.Ct. at 3464 (In light of Nebraska's conservation efforts, groundwater, a paradigmatic natural resource, "has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage.").
 
 
 37
 A second complication in relying upon a natural resource exception in the instant case flows from the idea that local benefits should follow local burdens, which the Supreme Court has relied upon in holding that state authorities can discriminate against out-of-state residents, even in cases involving a natural resource. See Sporhase, supra; cf. Baldwin v. Fish & Game Commission of Montana, 436 U.S. 371, 389-90, 98 S.Ct. 1852, 1863-64, 56 L.Ed.2d 354 (1978) (Montana law charging residents $9 and nonresidents $225 for an elk hunting license held not to violate equal protection because state devoted resources to elk conservation). Waste disposal is unlike some other natural resource industries in that few communities welcome the opening of a waste disposal site in their midst. The opening of the site is often viewed as a threat to property values and quality of life that is acceptable only because of the pressing need for waste disposal.[3]
 
 
 38
 A third complication is that categorizing a landfill as a "natural resource" simply because it is built on land proves too much. Since we can presume that South Dakota's cement plant was built on land, the mere fact that a state uses land to participate in the market cannot by itself preclude it from relying on the market participant doctrine. A land-use natural resource exception to that doctrine, if there be one, must rest upon a more particularized inquiry. Rather than land in general, one might consider the natural resource to be land that is practicably available for the construction of a landfill. Such land could, presumably, be distinguished from land available for the construction of a cement plant through the introduction of evidence that land available for cement plants is plentiful and land available for landfills is scarce.
 
 
 39
 Although it would makes some sense (in light of the cement-plant-on-land problem) to distinguish between land in general and land practicably available for the construction of landfills, it would nevertheless be problematic to use such an availability figure to determine whether landfills constitute a natural resource. Shortages of land available for landfill construction may be created by vigorous local opposition to using geologically suitable land to build landfills or by a state's hesitation, in light of the financial cost, to build landfills on geologically suitable land that it has already permitted to be dedicated to residential, commercial, industrial, or recreational use. To the extent that a shortage of landfillavailable land is caused by such political factors, characterizing landfill-available land as being in short supply (and hence distinguishable from land available for cement plants) would seem inconsistent with a "happenstance" rationale for the natural resources exception to the market participant doctrine, as past and present political choices are not the product of geological happenstance.
 
 
 40
 In light of these considerations, we conclude that while there may be some place for a natural resource exception to the market participant doctrine, such an exception should not apply in the instant case. The present case is not one in which a state has "hoard[ed] resources which by happenstance are found there." Reeves, 447 U.S. at 444, 100 S.Ct. at 2281. Rather, a state subdivision has used initiative to build a waste disposal facility to serve its needs. Furthermore, given Lycoming's recycling program, one could say, as the Supreme Court did with respect to Nebraska's water conservation program, that "the continuing availability of [the landfill] is not simply happenstance; the natural resource has some indicia of a good publicly produced and owned in which a State may favor its own citizens in times of shortage." Sporhase, 458 U.S. at 957, 102 S.Ct. at 3464. We also take cognizance of the difficulties often attendant in efforts by municipalities to build waste disposal sites in light of their unpopularity with local residents. Neither the sacrifice of local residents in allowing a landfill to be built nearby nor the political character of much of the shortage of land available for landfill construction should be ignored.
 
 
 41
 This is not a case in which a state has hoarded a resource like coal or oil that is geologically peculiar to that state (although even with respect to such a natural resource, the Supreme Court has permitted states to exploit their monopoly position by exporting tax burdens to other states through facially neutral tax statutes, see, e.g., Commonwealth Edison Co. v. Montana, 453 U.S. 609, 619 & n. 8, 101 S.Ct. 2946, 2954 & n. 8, 69 L.Ed.2d 884 (1981)). Nor is this a case in which a state has used its ownership of land to discriminate against the transportation of goods in interstate commerce. Cf. Shell Oil Co. v. City of Santa Monica, 830 F.2d 1052 (9th Cir.1987) (city not a market participant where it assesses franchise fee on oil company seeking to build oil pipeline beneath city streets), cert. denied, --- U.S. ----, 108 S.Ct. 2901, 101 L.Ed.2d 934 (1988); Western Oil & Gas Association v. Cory, 726 F.2d 1340 (9th Cir.1984) (state not market participant in imposing fee for transportation of crude oil from offshore oil rigs across state-owned tidal and submerged lands), aff'd without opinion by an equally divided Court, 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985). These right-of-way or transportation cases raise a discrete set of concerns, as open "channels of commerce ... are essential to the market itself" because they are "essential to [an outsider's] ability to do business in the state." Gergen, The Selfish State and the Market, 66 Tex.L.Rev. 1097, 1132-33 & n. 188 (1988).
 
 C. Summary
 
 42
 The Supreme Court has repeatedly affirmed the principle that "[n]othing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." Alexandria Scrap, 426 U.S. at 810, 96 S.Ct. at 2498 (footnotes omitted). We are not persuaded that a county's rules as to who may use its landfill are sufficiently suggestive of abuse of state power for us to depart from this principle. Other courts that have faced the issue whether public entities operating state landfills are market participants have come to the same conclusion.[4] Because we conclude that under the pleaded facts Lycoming has acted as a market regulator rather than a market participant, we will affirm the district court's dismissal of Swin's commerce clause claim.
 
 
 43
 Judge Gibbons would bypass our analysis in its entirety and hold that the Supreme Court effectively overruled the market participant doctrine cases in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). That Congress has a (virtually) absolute authority to enact legislation affecting the operation of state governments, as Garcia held, does not, however, imply that the federal courts should hold unconstitutional state action previously held constitutional as falling within the market participant doctrine. Garcia permits Congress to require state-operated landfills to accept out-of-state garbage on terms equal to those governing the acceptance of in-state garbage or to overturn the market participant doctrine in its entirety. Garcia does not require the Courts of Appeals to do so absent Congressional action.
 
 
 44
 And even if Judge Gibbons is correct in reasoning that Garcia undermined the logical basis for the market participant doctrine cases, we lack the authority to overrule them. "If a [Supreme Court] precedent ... has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., --- U.S. ----, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989).
 
 III. THE EQUAL PROTECTION CLAIM
 
 45
 In light of Justice Stone's insight that a state law principally harming those outside the state is unlikely to be subject to the political restraints normally brought to bear on laws adversely affecting those within the state, see South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 184 n. 2, 58 S.Ct. 510, 513 n. 2, 82 L.Ed. 734 (1938), and his theory that courts should most carefully scrutinize the constitutionality of legislation harming those at a disadvantage in the political process, see United States v. Carolene Products Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783-84 n. 4, 82 L.Ed. 1234 (1938) (citing 303 U.S. at 184 n. 2, 58 S.Ct. at 513 n. 2), one might expect a high level of judicial solicitude for claims that a state or state subdivision has discriminated against out-of-state residents. The Supreme Court, however, has repeatedly held that a statute being challenged by those asserting such an equal protection claim, in a case "impinging upon no fundamental interest," is to be reviewed under the rational basis standard that is normally used in matters of economic regulation. Alexandria Scrap, 426 U.S. at 813, 96 S.Ct. at 2499-2500. See, e.g., Northeast Bancorp, Inc. v. Board of Governors, 472 U.S. 159, 178, 105 S.Ct. 2545, 2555-56, 86 L.Ed.2d 112 (1985); Western & Southern Life Insurance Co. v. State Board of Equalization, 451 U.S. 648, 657, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981); Baldwin v. Fish & Game Commission of Montana, 436 U.S. 371, 391, 98 S.Ct. 1852, 1864, 56 L.Ed.2d 354 (1978).
 
 
 46
 The equal protection clause is satisfied, under this standard, as long as the legislature "rationally could have believed" that the statutory classification would promote a legitimate objective. Whether the statutory classification is "in fact" successful in accomplishing that objective is irrelevant. Western & Southern Life Insurance Co., 451 U.S. at 672, 101 S.Ct. at 2085 (emphasis omitted). States are "accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). A statutory classification "need not be drawn so as to fit with precision the legitimate purposes animating it." Alexandria Scrap, 426 U.S. at 813, 96 S.Ct. at 2499. And economic legislation " 'carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality' " such that " 'the varying treatment of different groups ... is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.' " Kadrmas v. Dickinson Public Schools, --- U.S. ----, 108 S.Ct. 2481, 2489, 101 L.Ed.2d 399 (1988) (citations omitted).
 
 
 47
 Swin argues that the asserted purpose of the disparate pricing scheme, to extend the useful life of the landfill to those within the Lycoming area, is illegitimate. We faced this issue in Hancock Industries v. Schaeffer, 811 F.2d 225 (3d Cir.1987), a case also involving a county's efforts to exclude non-local waste as a means of preserving landfill capacity. We readily concluded that "providing for the continued disposal of ... County trash is a legitimate interest of the [County] Authority and would constitute a legitimate purpose for the exclusionary policy under [equal protection] attack." 811 F.2d at 238. Countless cases have held that caring for local or regional needs is a legitimate purpose of local government. See, e.g., Northeast Bancorp, 472 U.S. at 177-78, 105 S.Ct. at 2555-56; Martinez v. Bynum, 461 U.S. 321, 328, 103 S.Ct. 1838, 1842, 75 L.Ed.2d 879 (1983); Western & Southern Life Insurance Co., 451 U.S. at 672, 101 S.Ct. at 2085; Alexandria Scrap, 426 U.S. at 814, 96 S.Ct. at 2500; Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 528, 79 S.Ct. 437, 441-42, 3 L.Ed.2d 480 (1959).
 
 
 48
 Swin also argues that even if preserving landfill capacity for the residents of the Lycoming County area is a legitimate purpose, the pricing scheme is not rationally related to that purpose. We agree with the district court, however, that "[a]ny hole, no matter how large, can only accept a specific volume of garbage." 678 F.Supp. at 1119. Charging higher prices for the disposal of distant garbage, thus reducing the flow of such garbage to the landfill, is manifestly related to the objective of preserving landfill capacity for local garbage. Our decision in Hancock is in accord with this view. See 811 F.2d at 238-39.
 
 
 49
 Lycoming's pricing scheme is rationally related to the legitimate purpose of preserving the landfill for local waste-producing residents. No more is required. We will affirm the district court's dismissal of Swin's equal protection claim.
 
 IV. THE 43 U.S.C. Sec. 931c CLAIM
 
 50
 Swin contends that Lycoming has violated 43 U.S.C. Sec. 931c (1982), which authorizes appropriate federal administrators to lease "public lands ... of the United States" to
 
 
 51
 States, counties, ... municipal corporations, or other public agencies for the purpose of constructing and maintaining on such lands public buildings or other public works. In the event such lands cease to be used for the purpose for which such permit, lease, or easement was granted, the same shall thereupon terminate.
 
 
 52
 43 U.S.C. Sec. 931c (emphasis added). Swin argues that Lycoming's restrictions on the use and cost of using the landfill deprive the landfill of its "public" character in violation of the statute. The threshold issue, however, is whether this statute creates a right of action permitting Swin to seek to enjoin its asserted violation.
 
 
 53
 Conceding that the statute does not contain an express right of action permitting it to sue, Swin contends that an implied right of action exists in its favor. In determining whether a federal statute that does not expressly provide for a particular private right of action nonetheless implicitly created that right, our task is one of statutory construction. The ultimate question in cases such as this is whether "Congress intended to create the private remedy ... that the plaintiff seeks to invoke." Northwest Airlines, Inc. v. Transport Workers Union of America, 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981). "[U]nless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." Id. at 94, 101 S.Ct. at 1582.
 
 
 54
 Nothing in the language or statutory structure of this statute indicates that Congress intended private parties to be able to sue under the statute. Nor is there any indication that Swin is among the class for whose "especial benefit" the statute was enacted, a consideration which the Supreme Court has held important in deciding whether Congress intended to create a private right of action. See Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975). The legislative history of the statute explains only that the legislation is
 
 
 55
 urgently needed to permit States and their local subdivisions to secure a tenure of use of sufficient duration to justify the expenditure of funds by State and local bodies for improvements of a permanent nature. Under present law some Federal agencies have no authority to issue long-term use permits, even to State and local public bodies. As a result local governmental units cannot afford to make substantial investments for improvements on such land with no guaranty of tenure, nor can they find a market for revenue bonds to finance the improvements.
 
 
 56
 H.R.Rep. No. 2243, 83rd Cong., 2d Sess. 1, reprinted in 1954 U.S.Code Cong. & Admin.News 3922, 3922. Nothing in the legislative history suggests that a private party in a position such as Swin has a right to sue under the statute. In light of these considerations, we conclude that Swin does not have a right of action under 43 U.S.C. Sec. 931c.
 
 V. CONCLUSION
 
 57
 For the foregoing reasons the judgment of the district court will be affirmed.
 
 
 58
 GIBBONS, Chief Judge, dissenting.
 
 
 59
 The majority opinion holds that Lycoming County's operation of a landfill falls within the "market participant" exception to the dormant Commerce Clause. This conclusion misapplies the Supreme Court's most recent limitation of this peculiar doctrine. It also fails to consider that exception in light of Garcia v. San Antonio Metropolitan Transportation Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1984). In consequence, finally, it ignores the market participant exception's economic unreality. Since neither this particular application of the exception, nor the exception itself, survives these considerations, I dissent from part II of the majority opinion.
 
 
 60
 * Thirteen years ago in a peculiar eruption of Dixieism, the Supreme Court announced that the dormant Commerce Clause (unexercised by Congress) did not reach local government's "non-governmental" participation in the market. Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). On the same day the Supreme Court, manifesting the same disease, also declared that the Commerce Clause granted Congress no power to regulate local governments' "governmental" functions. National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Garcia has since expressly dispensed with the doctrine of National League of Cities, 469 U.S. at 531, 105 S.Ct. at 1007. In so doing, it also effectively eliminated the Dixiecrat basis for Alexandria Scrap, its progeny, and the market participant exception.
 
 
 61
 When Alexandria Scrap first carved out the market participant exception to the federal law on the dormant or unexercised reach by the Commerce Clause it did so narrowly. The case involved a Maryland statutory scheme designed to rid the state of derelict automobiles by granting wreckers who brought such vehicles to a licenced scrapper a bounty to be shared between the two. An amendment placed a higher administrative burden on out-of-state scrappers applying for the bounty than on their Maryland counterparts. 426 U.S. at 795-99, 96 S.Ct. at 2491-93. The Court held that the amendment was not an impermissible burden on interstate commerce. Justice Powell, writing for the majority, noted that Maryland had not attempted to regulate the flow of interstate commerce by placing limits on goods before they could move beyond the state's borders. Rather, the Court concluded that Maryland had in effect entered the market as a participant by making goods more lucrative if processed within the state. Id. at 807, 96 S.Ct. at 2496-97. It was in this context that the Court more generally opined that the Commerce Clause does not prohibit states "from participating in the market and exercising the right in favor of its citizens." Id. at 809-10, 96 S.Ct. at 2498.
 
 
 62
 The Court expanded Alexandria Scrap into a categorical exception to the unexercised Commerce Clause in Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1976). It also applied the doctrine to the prohibition of goods from leaving a state rather than merely the inducement of goods into a state. Reeves involved a South Dakota policy restricting the sale of cement produced at a state-owned plant to state residents. Id. at 431-34, 100 S.Ct. at 2274-76. Justice Blackmun, relying in part on National League of Cities, postulated a fundamental distinction between states as market regulators and states as market participants. The Court read Alexandria Scrap as holding that "the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace." Id. 447 U.S. at 436-37, 100 S.Ct. at 2277.[1] Making this categorical distinction, the Reeves court concluded that the negative Commerce Clause did not bind regardless of whether a state "market participant" attempted to attract interstate commerce from without or to impede it from leaving within. Id. at 444 n. 17, 100 S.Ct. at 2281 n. 17.
 
 
 63
 The Court widened the market participant exception still further in White v. Massachusetts Council of Construction Employers, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). White dealt with an executive order of the Mayor of Boston requiring that all construction projects funded in whole or in part by city money to be performed by a work force composed of at least 50% Boston residents. 460 U.S. at 211, 103 S.Ct. at 1046. In an opinion by Justice Rehnquist, the Court upheld this local resident condition by reading Alexandria Scrap and Reeves as standing for "the proposition that when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause." 460 U.S. at 208, 103 S.Ct. at 1044. Justice Blackmun, the author of Reeves, dissented on the ground that the majority position would effectively permit any degree of market participation to render a state activity immune from Commerce Clause intrusion. 460 U.S. 216-25, 103 S.Ct. at 1049-54. (Blackmun, J. dissenting).
 
 
 64
 The Court eventually had second thoughts, limiting the market participant exception in South-Central Timber Development, Inc. v. Wunnicke, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), a decision that would place the Lycoming County landfill outside the doctrine. In South-Central Timber, the Court held that an Alaska regulation mandating the in-state processing of timber from state lands prior to export did not enjoy an implicit Congressional sanction from a parallel policy for timber harvested from Federal land. Id. at 87-93, 104 S.Ct. at 2240-43. Writing for a plurality, Justice White went on to reject Alaska's contention that regulation fell within the market participant doctrine. The plurality distinguished Alexandria Scrap by noting that Alaska did not offer a subsidy. It distinguished Reeves by noting that the Alaska regulation involved foreign commerce, a natural resource, and restrictions on resale of that resource. Finally, it distinguished White by suggesting that the limit of the market participation exception must at least be the "narrowly defined" market in which the state participates. Otherwise, the plurality stated, the exception "has the potential of swallowing up the rule that States may not impose substantial burdens on interstate commerce even if they act with the permissible state purpose of fostering local industry."
 
 
 65
 Justice White concluded that while Alaska may qualify as a participant in the timber market, the state's policy exerted a regulatory effect in the downstream timber-processing market in which it did not participate. Id. at 97-99, 104 S.Ct. at 2245-47 (White, J., plurality opinion). South-Central Timber defined such markets as: first, outside the immediate disposition of a product; and second, consisting of the separate economic activities of the local government's trading partners. Id. at 98-99, 104 S.Ct. at 2245-47. The Alaska regulation failed on both counts: in conditioning the initial sale on subsequent processing the policy, first, effectively affected a transaction beyond the initial sale of a product, and, second, sought to govern the downstream activity of the purchaser.
 
 
 66
 There is no principled way to distinguish this case from South-Central Timber. Lycoming County does not participate in a market "for disposal services." Rather, like any other landfill, it sells space to concerns that have earlier transacted to purchase and process solid waste. No less than with Alaskan timber, conditions on the sale of Pennsylvanian space, at least when based on the origin of incoming solid waste, have a significant regulatory impact on markets in which the county does not participate. Like the Alaska prohibition, Lycoming County's price structure in reality attempts to restrict waste processors from purchasing waste from outside the county and state; transactions clearly beyond those involving the processors and the county itself. Also like the Alaskan policy, the county pricing scheme governs the "private economic relationships of its trading partners"; namely, the patterns of trade between concerns like Swin and its waste suppliers in New Jersey.
 
 
 67
 The only conceivable distinction between the two situations lies in the timing of the extra-market activity affected. With timber the impermissible restrictions hindered post-purchase activity; in the case of landfill space the burdened activity is retrospective. That the regulation here thus affects an "upstream" rather than "downstream" market in no way salvages the county's policy from Commerce Clause disfavor.
 
 
 68
 The Lycoming landfill does not qualify as a market participant even absent the limit of the South-Central Timber plurality. Unlike Alexandria Scrap, the county is not encouraging goods across its borders by means of a bounty, but is instead prohibiting the interstate flow of goods by means of a discriminatory charge. See Alexandria Scrap, 426 U.S. at 804-06, 96 S.Ct. at 2495-96. Unlike Reeves and White, the county has not entered a highly competitive market dominated by private enterprise, such as concrete and construction, but has rather entered a hybrid area that involves a distinctive public need in a highly regulated environment. See Hancock Industries v. Schaeffer, 811 F.2d at 231-32 (3d Cir.1987). In this regard, the operation of a municipal landfill is no more an entry into a local market than is the operation of a municipal school system.[2]
 
 
 69
 South-Central Timber is also significant in anticipating the Supreme Court's tacit rejection of the market participant theory in Garcia. The Alexandria Scrap line of cases rests upon substantially the same notoriously flawed analytic framework of the state-federal relationship made infamous in National League of Cities, the companion case to Alexandria Scrap. In National League of Cities, the Court held that the Commerce Clause did not empower Congress to enforce the minimum-wage and overtime provisions of the Fair Labor Standards Act against states in "areas of traditional government functions." 426 U.S. at 852, 96 S.Ct. at 2474. Eight years later, and subsequent to all four market participant cases, Garcia explicitly overruled the Commerce Clause analysis of National League of Cities.[3] Since this now-rejected analysis also underlies Alexandria Scrap, Reeves, White, and even South-Central Timber, this Court should reject the market participant exception in light of Garcia 's mandate.
 
 
 70
 Garcia overturned National League of Cities on two main grounds: first, that the concept of "traditional" governmental functions was unworkable; and second, that the true safeguard of state sovereignty lies not with judicially-imposed limits on the reach of the Commerce Clause in the interest of states rights but in the procedural political safeguards present in Federal government. The Court observed that the lower courts' numerous attempts to apply the National League of Cities standard of "traditional," "historic," "integral," or "non-proprietary," to actual government functions had proven wildly inconsistent. 469 U.S. at 538-39, 105 S.Ct. at 1010-11. Among the instances so noted is one case deeming solid waste disposal a traditional government activity. Id. at 538, 105 S.Ct. at 1010-11 (citing Hybud Equipment Corp. v. City of Akron, 654 F.2d 1187, 1196 (6th Cir.1981). The Court therefore rejected any attempt at judicial determination of what was or was not a proper governmental function for Commerce Clause purposes. Viewing the consequence of National League of Cities in tandem with democratic theory, the Court declared:
 
 
 71
 We therefore now reject, as unsound in principle and unworkable in practice, a rule of state immunity from federal regulation that turns on a judicial appraisal of whether a particular governmental function is "integral" or "traditional." Any such rule leads to inconsistent results at the same time that it disserves principles of democratic self-governance, and it breeds inconsistency precisely because it is divorced from these principles. If there are to be any limits on the Federal Government's power to interfere with state functions ... we must look elsewhere.
 
 
 72
 Id. at 546-47, 105 S.Ct. at 1015 (emphasis added).
 
 
 73
 The Garcia court found these limits in the structure of the Federal government. The devices cited included state representation in the Senate, the electoral college, and separation of powers prevention of a single-minded attack on state sovereignty. From this survey the Court concluded that the fundamental limits on the scope of the Commerce Clause are not categorical but procedural, stating that "[a]ny substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than dictate a 'sacred province of state autonomy.' " Id. at 554, 105 S.Ct. at 1019 (citation omitted).
 
 
 74
 Rejection of the market participant theory necessarily follows from Garcia on each of that case's main premises. First, the regulatory/government distinction is nothing more than the integral/non-integral distinction in another guise. To be sure, the distinction played divergent roles depending upon whether Congress had acted. Under National League of Cities, the label of "integral" or "governmental" protected a state activity from the Commerce Clause; under Alexandria Scrap, the label "regulatory" or "governmental" left a state activity open to (dormant) Commerce Clause attack. The different uses of the categories, however, changes neither their similarity nor their invalidity. Garcia noted at length the inherent unworkability of such labeling. Indeed, in other contexts, courts have concluded exactly what the cases cited by the majority deny, that the operation of a landfill is an integral, traditional governmental activity. See Hybud Equipment Corp., 654 F.2d at 1196 (deeming landfill operation a traditional governmental activity); Hancock, 619 F.Supp. 322, 328 (E.D.Pa.1985) (stating, without deciding, that counties "simply regulat[e]" landfills), 811 F.2d 225, 231-32 (3d Cir.1987) (holding county operation of landfill "state action" for antitrust purposes).
 
 
 75
 Likewise, Garcia 's reliance on procedural over categorical safeguards necessarily follows with respect to the dormant Commerce Clause no less than in its legislative aspect. Garcia reflected this reliance by asking whether, absent facile categories, Congressional action under the Commerce Clause violated state sovereignty given the procedural safeguards the states enjoy under the Constitutional framework. 469 U.S. at 547-55, 105 S.Ct. at 1015-20. Here the inquiry logically becomes whether, again absent categories like "participant" and "regulator," a state activity burdens interstate commerce given the economic safeguards that parties engaging in interstate commerce enjoy in a national economy. States affected by a measure under the court's application of the dormant Commerce Clause are free to seek redress through the national political process;[4] only when Congressional action undermines that process may courts limit that action. Parties like Swin affected by a state's purported private commercial activity are left to respond through the national free market; only when the state's measure distorts usual market processes may the courts invalidate such a measure. In each instance the question turns on whether the challenged activity assaults a value protected by the Constitution despite protections inherent in the national framework.[5]
 
 
 76
 In light of Garcia, the Commerce Clause clearly prohibits the three-tier fee structure of Lycoming County. In the first instance, no facile analogy of the county to a private landfill operator, or labelling of its operation as "non-governmental" or "non-regulatory" automatically protects the county's activity. Instead, the proper inquiry is whether the county's actions distort market forces in such a way that private parties engaged in interstate commerce cannot realistically respond or compete. Here the answer must be yes. No number of efficiencies on Swin's part would overcome the $16.75 to $20.00 per ton differential that effectively bars New Jersey's solid waste from crossing the Delaware to Lycoming. Given the county's discriminatory rate structure, there is simply no way that private processors purchasing out-of-state waste could through the market compete against those who use Pennsylvania's waste exclusively for the use of the Lycoming landfill.
 
 
 77
 Viewed in this way, Garcia 's repudiation of the market participant doctrine reflects economic reality and common sense. The notion that state enterprises "participate" in the market on the same footing as private concerns is a chimera. Private market participants have limited resources and must ultimately seek a profit to survive. In contrast, government "market participants" invariably seek political goals in the place of economic ends. They do so because the ultimate option of raising compulsory revenue affords governments the luxury of ignoring bottom lines in a manner no private concern would dare.
 
 
 78
 The present appeal provides a typical case in point. However much their market might be regulated, private landfill operators still desire to turn a profit. Few, if any, would give a second thought to the origin of the waste filling the space sold. Nor is it likely that any would long stay in business even assuming some highly unusual public commitment to the preservation of that space by locals. Under any realistic view, the Lycoming landfill in private hands would never have hindered its ability to sell space to the highest bidder by erecting a differential rate structure that discriminated against waste the further its point of origin. If anything, it would have created a fee structure that did precisely the opposite. A vendor of landfill space hoping to attract business, as do genuine market participants, would logically attempt to lure large volume purchasers concerned with transportation costs through a discount, especially when it appeared that customers dealing in local waste could not themselves provide sufficient business. As an exercise toward the political end of saving space for county waste, Lycoming County's price structure makes good regulatory sense. As an essay in market participation, it is aberrant and the majority's application of the label "market participant" to Lycoming County is an economic jest.
 
 
 79
 The other market participation cases on which the majority rely are no less anomalous. No private real estate developer in a competitive market would last long given a self-imposed, political restriction of its work force to local residents assuming the availability of cheaper or more qualified labor residing elsewhere. See White, 460 U.S. at 208, 103 S.Ct. at 1044-45. Nor in any realistic sense does a state-backed concrete producer that restricts the sale of its product on political grounds resemble a private business. See Reeves, 447 U.S. at 437-39, 100 S.Ct. at 2277-79. Nor, finally, would any private scrapper be likely to grant a bonus to wreckers carting hulks from within a state. See Alexandria Scrap, 426 U.S. at 804-06, 96 S.Ct. at 2495-96. The whole charade of the market participant exception totally unrelated to the regulatory effect of free markets operating with a profit motive, was never anything but a peculiar manifestation of the "new federalism" run amok; states rights in drag. Garcia, I believe, signals that the Supreme Court has turned its back on the political rhetoric of the "new federalism," and on its economically deformed market participant sibling.
 
 II
 
 80
 It is not the task of this Court to overrule past Supreme Court decisions in light of later precedents. Instead, this Court must apply current Commerce Clause jurisprudence to the present appeal. That jurisprudence at the very least precludes application of the market participation doctrine to this case. Properly read, it further requires the rejection of that doctrine and the economic fantasies that underpin it. For all these reasons, I dissent from the application of the so called market participant exception to the Commerce Clause in this case.
 
 
 
 [1]
 Judge Gibbons attempts to distinguish the case at bar from Reeves by asserting that cement manufacturing is "a highly competitive market dominated by private enterprise." Diss. Op. at 259. This assertion, however, is contradicted by the facts of Reeves itself. The State of South Dakota built the cement plant at issue in that case not to compete with those operated by private enterprises but because no cement plant was operating in the state. See 447 U.S. at 430-31 & n. 1, 100 S.Ct. at 2273-74 & n. 1
 
 
 [2]
 Judge Gibbons states that "the operation of a municipal landfill is no more an entry into a local market than is the operation of a municipal school system." Diss. Op. at 259. We know of no case, however, that holds that municipalities must permit out-of-state students to matriculate in its public schools on equal terms with in-state students in order to comply with the commerce clause. Indeed, the Supreme Court has summarily affirmed a decision upholding a state statute requiring out-of-state students to pay higher tuition than in-state students in order to attend a state university, see Sturgis v. Washington, 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464, aff'g mem. 368 F.Supp. 38 (W.D.Wash.1973) (three-judge court), and has upheld state residence requirements governing entitlement to tuition-free public schooling on the ground that a residence requirement "furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents," Martinez v. Bynum, 461 U.S. 321, 328, 103 S.Ct. 1838, 1842, 75 L.Ed.2d 879 (1983). See also Reeves, 447 U.S. at 442, 100 S.Ct. at 2280
 
 
 [3]
 See generally State of New Jersey County and Municipal Government Study Commission, Solid Waste Management in New Jersey 52-53 (1987) ("Clearly, the sitting function is the most difficult of all planning tasks contained in the [New Jersey] Solid Waste Management Act. The simple truth is that people do not want a disposal facility, whether it be a mass-burner or a landfill, located in their neighborhood or community. The specter of smoke, odors, polluted water supplies, fleets of garbage trucks, and windblown refuse convinces much of the public that there has to be a different location for garbage disposal. Citizens have become very emotional and adamant on this issue."); Shapiro, The Process of Resource Recovery Siting, 9 Seton Hall Leg.J. 403, 403 (1985) (discussing the severe NIMBY--"not in my back yard"--problem in New Jersey with respect to solid waste disposal); Mathesius, The Functions of Psychology, Process and Entropy in the Siting of Solid Waste Disposal Facilities, 9 Seton Hall Leg.J. 415 (1985) (same); Sandman, Getting to Maybe: Some Communications Aspects of Siting Hazardous Waste Facilities, 9 Seton Hall Leg.J. 437 (1985) (same); McGuire, The Dilemma of Public Participation in Facility Siting Decisions and the Mediation Alternative, 9 Seton Hall Leg.J. 467 (1985) (same); Alm, "Not in My Backyard": Facing the Siting Question, 10 EPA J. 8 (Oct.1984) (NIMBY problem throughout nation with respect to solid waste disposal); Glaberson, Coping in the Age of "Nimby", N.Y. Times, June 19, 1988, Sec. 3, at 1, col. 2 (same); Comment, Down in the Dumps and Wasted: The Need Determination in the Wisconsin Landfill Siting Process, 1987 Wis.L.Rev. 543, 545 n. 13 (NIMBY problem in Wisconsin with respect to solid waste disposal); O'Hare, "Not On My Block You Don't": Facility Siting and the Strategic Importance of Compensation, 25 Pub.Pol'y 407 (1977) (benefit-cost analysis of the problem)
 
 
 [4]
 See County Comm'rs of Charles County v. Stevens, 299 Md. 203, 473 A.2d 12 (1984); Lefrancois v. Rhode Island, 669 F.Supp. 1204 (D.R.I.1987); Evergreen Waste Sys., Inc. v. Metropolitan Serv. Dist., 643 F.Supp. 127 (D.Or.1986), aff'd on different grounds, 820 F.2d 1482 (9th Cir.1987); Shayne Bros., Inc. v. District of Columbia, 592 F.Supp. 1128 (D.D.C.1984); but cf. Washington State Bldg. & Constr. Trades Council v. Spellman, 684 F.2d 627, 631 (9th Cir.1982) (holding state not a market participant in closing its borders to out-of-state low-level radioactive waste since "measure denies entry of waste at the state's borders rather than at the site the State is operating as a market participant" and "measure establishes civil and criminal penalties which only a state and not a mere proprietor can enforce"), cert. denied, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). See generally Comment, Recycling Philadelphia v. New Jersey: The Dormant Commerce Clause, Postindustrial "Natural" Resources, and the Solid Waste Crisis, 137 U.Pa.L.Rev. 1309 (1989)
 
 
 [1]
 Reeves also paradoxically counseled against interfering with states in their non-sovereign capacity as market participants on grounds of state sovereignty. 447 U.S. at 429, 100 S.Ct. at 2271
 
 
 [2]
 The majority's glib response to this observation, page 251 n. 2, entirely misses the point. Local school district pupil placement escapes dormant commerce clause scrutiny not because school districts are market participants, but because offering instruction to pupils has not been traditionally regarded as commerce. Operating sanitary landfills is commerce. City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). A Pennsylvania regulation prohibiting school districts from purchasing pencils, paper, or milk originating in New Jersey would affect commerce, and could escape dormant commerce clause scrutiny only by virtue of an exception. Such a regulation would not be adopted by any rational decisionmaker acting consistently with market motivations. It might well be adopted by a rational local politician who had a local contributor in the school supply or milk business. Apparently the majority would uphold such a regulation which demonstrates that its application is nothing more than an application of National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) in drag. That is true as well, of course, of Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)
 
 
 [3]
 Since Garcia, only two cases have discussed the market participant doctrine to any degree; neither applied it. See New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988); Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc., 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986)
 
 
 [4]
 E.g. Prudential Ins. Co. v. Benjamin, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) (State taxation of foreign insurance companies does not violate commerce clause where Congressional act authorizes tax.)
 
 
 [5]
 Logic might suggest that not only the states as states but private parties as well should address federalistic concerns to Congress. See J. Choper, Judicial Review and the National Political Process (1980). One reason against extending the matter this far is the comparatively greater power of the states in national politics than of any individual. In any event, the Court has thus far only addressed the problem of the unique role of states as states