**GOVERNMENT SUPPLIERS CONSOLIDATING SERVICES, INC., and Jack Castenova, Inc., Plaintiffs,**

v.

**The Honorable Evan BAYH, Governor of the State of Indiana, and the State of Indiana, Defendants.**

**No. IP 90–303–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

April 3, 1990.

Ronald J. Waicukauski, White & Raub, Indianapolis, Ind., Bruce L. Thall, Philadelphia, Pa., for plaintiffs.

Harry John Watson, III, Michael T. Schaefer, Office of Attorney General, Indianapolis, Ind., for defendants.

## MEMORANDUM ENTRY REGARDING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

TINDER, District Judge.

The problem of where to dispose of solid waste promises to be one of the most complex, expensive and emotional issues to confront this Nation as it prepares to enter the twenty-first century. With recycling technology lagging far behind this country's ability to produce trash, we must continually search for new places to put all the

things that we have discarded. This case is about that search. Everyone would agree that trash must be disposed of, but very few would volunteer to have it dumped in the environment near their homes. The simple truth is that no one wants to live near a landfill with the accompanying odors, fleets of garbage trucks, and pollution. However, the "not in my back yard" (or "NIMBY") attitude, as it has been described, while understandable, is not conducive to finding legal and efficient solutions to this dilemma. *See Swin Resource Sys. Inc. v. Lycoming County, Pennsylvania,* 883 F.2d 245, 253 n. 3 (3d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). In this Union of states, the citizens of each state enjoy constitutional benefits as well as responsibilities. If we address national problems of this type without due regard for our neighbors with whom we share these problems, we fail to fulfill our constitutional obligations and deny others the rights and privileges which we hold so dear. This conundrum deserves a thorough and deliberate analysis. Such an inquiry requires due regard for constitutional requirements and precludes treatment of the problem with perfunctory but popular placebos.

Plaintiffs are two out-of-state companies that are engaged in the business of hauling solid waste by truck to permanent disposal sites. These companies have sued Evan Bayh, the Governor of Indiana, and the state of Indiana, seeking to stop the Governor and the state from enforcing a law recently passed by the Indiana General Assembly and signed into law by the Governor. *See* Engrossed House Bill No. 1240 (a copy of the Enrolled Act was unavailable at the time this opinion was released).

This law places certain requirements on haulers who dump solid waste in landfills located in the state. The law requires the drivers of the trucks to identify, under penalty of perjury, the county in Indiana or, if outside Indiana, the state in which the "largest part" of the solid waste was "generated." This requirement I refer to as the "hauler certification" requirement throughout this opinion.

The law also prohibits in-state dumping of out-of-state solid waste unless the driver importing the waste presents to the landfill operator a "document" from a health officer from the foreign state certifying that the solid waste does not contain any hazardous waste in violation of federal law or any infectious waste in violation of Indiana law. This requirement I refer to as the "state health officer certification" requirement.

In addition, the law imposes a "tipping" fee on every ton of trash dumped into a landfill located within the state. This fee is paid to the landfill operator, and is passed on to the state to be used in various ways related to waste disposal. The amount of the tipping fee varies tremendously. The lowest amount of the fee is $0.50 a ton for trash generated in the state of Indiana. Trash generated outside the state is assessed a much different, and presumably higher, fee. That is, the fee for dumping trash which is generated in states outside Indiana is set so that the total cost of dumping the out-of-state trash in Indiana equals the cost of dumping the trash at the landfill nearest the point of generation of the trash. This is statutorily achieved by setting the Indiana dumping fee so that it is equal to the difference between the cost of dumping in the landfill closest to the source of the trash and the cost charged by the Indiana landfill owner for dumping in the Indiana landfill. Thus, the out-of-state trash hauler has no economic incentive to import trash into this state. In fact, the extra cost of transporting the waste from the landfill nearest the generating site to Indiana serves as a strong disincentive on importing trash into the state. While the first two challenged provisions went into effect with the Governor's signature, the tipping fee provision does not go into effect until January 1, 1991. This requirement I refer to as the "tipping fee" requirement.

■ Plaintiffs have challenged the newly enacted law on three constitutional grounds—the commerce clause, the fourteenth amendment's equal protection

clause, and vagueness under the due process clause of the fifth amendment.[1]

Although these claims will be fully tried later this month, the plaintiffs, fearing immediate and irrevocable harm from even the temporary enforcement of this law, have moved this court for a temporary restraining order, which this court has converted into a motion for a preliminary injunction. *See infra* at 861–62. A hearing on this motion was held on Monday, March 26, 1990 at which counsel for both the plaintiffs and the defendants presented arguments for and against the granting of an injunction. Because the case had been before me less than one full business day and a weekend, and because of the complexity and importance of the issues involved, I took the motion under advisement. After carefully considering the arguments presented by both parties, and researching the issues involved to the fullest extent possible in the short period of time which has elapsed in this case, I have reached a decision on the request to preliminarily enjoin the three aspects of the statutory scheme cited above. A full discussion of the reasoning behind this decision follows.

It should be noted at the outset that all determinations made herein, both factual and legal, are preliminary in nature and are subject to a complete reconsideration and perhaps revision or reversal after the trial on the merits is held in this matter. The tentative nature of this ruling accompanies all preliminary rulings in a case of this sort where the court is asked to evaluate a legal dispute on an emergency schedule absent a full presentation of evidence and a full briefing of the relevant legal issues. Thus, neither party should assume that any finding or conclusion contained herein has been conclusively made, or that its burden of proof or opposition on any of the points discussed here has been met with respect to the trial on the merits.[2]

## I. *Standing and Ripeness*

### A. Constitutional and Prudential Considerations of Standing

■ Although neither party points to the doctrine of standing as a potential stumbling block, a court is empowered, indeed required, to raise it *sua sponte. United States v. Storer Broadcasting Co.,* 351 U.S. 192, 197, 76 S.Ct. 763, 767, 100 L.Ed. 1081 (1956). The doctrine of standing is grounded both on constitutional and prudential considerations, with the division between the two often a blurry one.

■ Standing under Article III of the United States Constitution involves a tripartite test; a plaintiff needs to show (1) that it has suffered a distinct and palpable injury, (2) caused by the challenged activity, (3) for which the court can provide a remedy. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

The prudential considerations of standing are satisfied if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

Placing these requirements on plaintiffs seeking access to the federal judiciary "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating

---

1. Although plaintiffs refer to the fifth amendment's due process clause in making their vagueness claim, that amendment applies only to the actions of the federal government, not the states. It is the fourteenth amendment's due process clause which prohibits the states from enacting unconstitutionally vague laws. The fifth amendment is not implicated in this case, nor is *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

2. Rather than separating findings of fact and conclusions of law into separate categories in this entry, the findings are designated by references to the affidavits and statutes submitted by the parties. The balance of the memorandum contains the conclusions. For the most part, the facts are not in dispute, but the parties disagree about the significance of these facts.

society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758.

■ My concern over standing grows out of the first prong of the three constitutional requirements for standing—a showing of a distinct and palpable injury to the plaintiffs. Plaintiffs point to two types of injuries in this case. First, drivers transporting solid waste into the state risk imprisonment on perjury charges for falsely certifying from which state the waste was generated. Second, complying with the new law will significantly drive up the cost of disposing of solid waste. What troubles me is the possibility that neither of these two injuries are being inflicted directly on the plaintiffs.` Without this injury, there is a risk the plaintiffs may lack a "direct stake in the outcome" of the litigation, which is traditionally viewed as the best means for ensuring that the issues are fully litigated in an adversarial atmosphere. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 740, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

As to the first type of injury, the plaintiffs in this case have not clearly shown that they actually employ the drivers who risk perjury convictions by transporting the trash into the state. Rather, the plaintiffs appear to be middlemen who simply contract with independent drivers to pick up and dispose of trash obtained from various cities and towns. At the hearing on the motion for a preliminary injunction, Mr. Thall, the plaintiffs' attorney, did represent to the court that he believed that the plaintiffs employed at least some of the truck-

ers. However, there is currently no clear evidence before the court to support this belief.[3]

■ The threat of physical imprisonment is not, however, the only form of injury that can confer standing. Economic injury alone is also sufficient. *Association of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 154, 90 S.Ct. at 830 (pointing out that the requirement of "injury" under the doctrine of standing can be met through a showing of either economic or non-economic injuries). Here, plaintiffs clearly assert that they will suffer economic injury as a result of the new law. *See* Affidavits of John Lynch and Jack Castenova. Without doubt, middlemen can be financially affected by restraints on interstate commerce, but this financial burden will in most instances be passed along to the ultimate consumer. It is the consumer who will be most directly affected by this law, and Article III requires me to pause in "due regard for the autonomy of those persons likely to be most directly affected by a judicial order." *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. at 759.

In this case, there are two types of consumers. The consumers of the solid waste are Indiana's landfill owners; the consumers of Indiana's landfill space are (conceivably) all trash-producing citizens of the United States. These two groups will bear the primary economic brunt of Indiana's new law.[4] Significantly, most of the persons who are directly affected by Indiana's new law—Indiana's landfill owners and the citizens of the other forty-nine states who may seek to dispose of their trash in our landfills—are not parties to this lawsuit.[5] The

---

**3.** In an affidavit submitted by the plaintiffs, Government Suppliers is described as a company "engaged in business as a shipper's agent and broker." Affidavit of John Lynch, at ¶ 3, p. 1. Another affidavit asserts that "[t]ruckers and haulers also depend on my business for their livelihood." Affidavit of Jack Castenova, at ¶ 12, p. 2.

**4.** The costs inflicted on these various groups is likely to vary widely. For example, careful readers of the law will note that the new statute permits landfill owners to retain one percent of the tipping fees they collect "as compensation

for collecting and remitting the fees" to the state. Ind.Code § 13–9.5–5–4(a). This legislative attempt to compensate landfill owners alters, to some degree, the normal economic incentives that would have aligned the interests of Indiana's landfill owners with the interests of out-of-state solid waste haulers and may explain why no Indiana landfill operator has sued to strike down this law.

**5.** Indiana citizens are also directly affected by this legislation, but their interests are being represented by the Attorney General of the state of Indiana.

doctrine of standing counsels me to hesitate to decide a case initiated by commercial middlemen when my decision could more drastically, and unpredictably, affect the financial interests of parties not before the court.

Ultimately, my concern over standing (and more specifically, plaintiffs' showing of direct injury) is assuaged by the Supreme Court's decision in *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). In that case, the legislature of the state of New York amended its long-standing law that imposed a tax on securities transactions occurring within New York. The amendment imposed a greater tax on transactions that occurred partly within and partly without New York than was imposed on transactions that occurred entirely within New York. Six regional stock exchanges sued to strike down the tax on grounds that it discriminated against interstate commerce in violation of the commerce clause. The State Tax Commission, in defending the tax, moved to dismiss the complaint on grounds that the plaintiffs lacked standing, since the tax applied not directly to the exchanges but only to the transfer of the commodities in which they dealt. The case was tried and appealed through the New York state court system, with every court along the way concluding that the plaintiffs did have standing. The United States Supreme Court agreed that standing was present, noting that the plaintiffs had properly alleged injury in fact. The regional securities alleged that they had lost business as a result of the discriminatory tax, and that their constitutional right to engage in interstate commerce had been infringed. *Id.* at 320–21 n. 3, 97 S.Ct. at 602–03 n. 3. Similarly, the plaintiffs in this case have alleged that their businesses will suffer as a result of the new law, and that their own right to engage in interstate commerce has been infringed. *See generally* Plaintiffs' Complaint.

While *Boston Stock Exchange* does indicate that the plaintiffs in this case could have standing even if they do not directly employ the drivers and even if they are only middlemen in the commercial transactions allegedly being restricted by Indiana's new law, this is a close question. On the strength of the *Boston Stock Exchange* case, I am able to push aside the above expressed concerns and am able to conclude that plaintiffs have standing.

### B. Ripeness: Avoiding a Premature Determination

■ Like the doctrine of standing, ripeness is also based on the dual grounds of compliance with Article III of the Constitution and prudential concerns. According to the Supreme Court, "[t]he question of ripeness turns 'on the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 190–91, 103 S.Ct. 1713, 1716, 75 L.Ed.2d 752 (1983) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). The question of ripeness in a declaratory judgment action is the following: " 'Basically, the question in each case is whether ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)). Although ripeness is usually addressed in terms of a case as a whole, the doctrine also applies to each claim within a case. *See Pacific Gas & Elec. Co.*, 461 U.S. at 200, 103 S.Ct. at 1720 (plaintiff's challenge to one statutory provision is ripe; challenge to second statutory provision is not ripe). In the following paragraphs, I address ripeness as to each challenged statutory provision.

■ Plaintiffs seek a declaratory judgment with respect to three requirements under the new law. The first two requirements (the hauler certification and the health officer certification) are clearly ripe for decision.

Both create a substantial controversy between the parties. The plaintiffs allege that they cannot comply with the certification requirements because they either lack the information sought or cannot obtain the appropriate approvals from the appropriate foreign health officers. Because of their inability to meet the statute's requirements, the plaintiffs will be denied access to Indiana's landfills and will be forced to dump in other states at greater cost. This, they allege, constitutes an unconstitutional impediment to interstate commerce, deprives them of equal protection of the laws, and violates due process. Defendants deny the discriminatory effect of the statute and deny that it is unconstitutionally vague.

There is also sufficient immediacy and reality to the controversy to warrant a decision on the merits of these two requirements. The plaintiffs allege they are currently unable to transport solid waste into Indiana because of the hauler and health officer certification requirements and that this has forced them to deposit the waste elsewhere at a greater cost.

■ The third challenged statutory requirement, however, may not be ripe for decision. This third requirement establishes an allegedly discriminatory tipping fee on haulers who deposit out-of-state solid waste at an Indiana landfill. While the first two requirements became effective with the Governor's signing of the bill, this last requirement does not go into effect until January 1, 1991. Since "ripeness is peculiarly a question of timing," *The Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), and the timing of the collection of the tipping fee provision is nearly nine full months away, I am hesitant to seize onto this claim without first carefully considering my authority to do so under Article III.

When I raised my concern over the ripeness of the challenge to the tipping fee provision at the hearing, plaintiffs' counsel asserted that this issue was ripe despite the fact that the tipping fee requirement does not begin until January 1, 1991. Plaintiffs' counsel noted that both the haul-er certification and the health officer certification requirements were immediately effective and that these requirements created a real dispute with a concrete factual setting. The ripeness of these two issues, argued plaintiffs' lawyer, was adequate to "ripen" the entire dispute into a "case or controversy." However, as *Pacific Gas & Electric Co.*, 461 U.S. at 200, 103 S.Ct. at 1720, demonstrates, ripeness as to one claim does not render the entire bushel of claims ripe. Plaintiffs need to establish the independent ripeness of *each* claim.

Perhaps recognizing the need to establish an independent showing of ripeness, plaintiffs' counsel directly addressed the ripeness of the third claim by asserting that the tipping fee requirement would have an immediate and damaging effect on plaintiffs' businesses, in spite of the fact the fees were not to be collected until January 1991. This immediate injury resulted from the present need to arrange future shipments of solid waste.

Plaintiffs' argument is a valid one. The law on ripeness clearly establishes that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923) (quoted in both *The Rail Reorganization Act Cases*, 419 U.S. at 143, 95 S.Ct. at 358 and *Pacific Gas & Elec. Co.*, 461 U.S. at 201, 103 S.Ct. at 1721).

Courts often conclude that a plaintiff is entitled to challenge in court the legality of an action that has not yet occurred. For example, the Second Circuit has stated that "the prospect or fear of future events may have a real impact on present affairs, such that a preemptive challenge is ripe." *Volvo N. Amer. Corp. v. Men's Intern. Professional Tennis Council*, 857 F.2d 55, 63–64 (2d Cir.1988) (citation omitted) (citing for support, *Bowsher v. Synar*, 478 U.S. 714, 727 n. 5, 106 S.Ct. 3181, 3188 n. 5, 92 L.Ed.2d 583 (1986); *Pacific Gas & Elec. Co.*, 461 U.S. at 201, 103 S.Ct. at 1721; *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 536, 45 S.Ct. 571, 573, 574, 69 L.Ed.

1070 (1925); *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 664, 67 L.Ed. 1117 (1923); and *North Am. Soccer League v. National Football League*, 465 F.Supp. 665 (S.D.N.Y.1979)).

In *Volvo*, the circuit court concluded that Volvo's antitrust challenge to the defendant's four *proposed* league rules presented a ripe controversy, despite the fact that the rules "may never be enacted." *Volvo N. Amer. Corp.*, 857 F.2d at 63. In reaching this conclusion, the court was strongly influenced by the fact that the mere proposal of rules or laws could have an immediate anti-competitive effect on the plaintiff's ability to enter into contracts concerning the sponsorship of professional tennis events, in violation of the antitrust laws. Similarly, the mere proposal of certain laws could have immediate deleterious effects on interstate commerce, especially where the commercial transactions threatened require advance planning.

Here, the plaintiffs are challenging an action far more certain to injure their interests than the mere proposal of a bill in the General Assembly. Instead, the plaintiffs face an enacted law that awaits only the passing of time before it becomes effective. While there is a theoretical chance that the law will not be enforced against these plaintiffs (the legislature could always repeal the law before 1991, or the plaintiffs could go out of the trash hauling business before then), the odds are high against that outcome. The state of Indiana, as evidenced by the statements of the Governor and the legislative members, appears determined to collect the full payment of the fees required under the new law. In addition, the plaintiffs are currently deriving healthy revenues from the interstate shipment of solid waste. They are unlikely to shut their businesses down voluntarily. Moreover, the fact that there is a slim chance the law will never go into effect does not mean that the law will not affect the plaintiffs' businesses well before 1991. Commercial transactions are rarely spontaneous exchanges of consideration. The advance planning required for the interstate shipment of solid waste could well be impaired by the fear of increased future costs.

Having identified a legitimate concern over the ripeness of the plaintiffs' challenge to the fees provision, I believe that the above discussion demonstrates this concern should not prevent me from exercising my Article III powers. The issues presented by the plaintiffs are ripe for decision. With respect to each challenged statutory provision, there exists a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a determination on the merits.

Although there exists a ripe controversy with respect to each of the three statutory provisions under attack, this is not to say that the timing is appropriate for a preliminary injunction decision on each of the provisions. The doctrine of ripeness addresses only a court's jurisdictional authority to hear a case. The decision to grant a preliminary injunction involves myriad additional factors, including the timing of the threatened conduct and the immediacy and irreparability of the harm likely to result. Although these points are fleshed out in the following discussion, they needed to be contrasted with the doctrine of ripeness here.

II. *Meeting the Preliminary Injunction Requirements*

Upon the filing of the declaratory action on March 23, 1990, the plaintiff requested a temporary restraining order (TRO) against the enforcement of the statute. The state was notified, and this court held a hearing on March 26, 1990, at which both the plaintiffs and the defendants were represented by counsel. A temporary restraining order that is granted without notice must be in compliance with Federal Rule of Civil Procedure 65(b). However, when the opposing party actually receives notice of the TRO request, the procedure that is required is not functionally different from that on an application for a preliminary injunction. 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2951 (1973). Indeed, if there is an adversarial hearing with all parties

862

present, the TRO request may be treated as a request for a preliminary injunction. *Id.* In this case, not only did the defendants receive notice and three days (one working day and a weekend) to prepare for the hearing, but this court allowed the defendants additional time to supplement their brief, with an opportunity for the plaintiffs to reply. Thus, this court will treat the TRO request as a request for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

■ The granting or denial of a request for preliminary injunction is ordinarily within the trial judge's discretion. *Hecht Co. v. Bowles,* 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *Hancock Indus. v. Shaeffer,* 619 F.Supp. 322, 326 (E.D.Pa.1985), *aff'd,* 811 F.2d 225 (1987). A preliminary injunction, however, is an extraordinary remedy that should not be granted except when the law, the facts, and the equities clearly appear to be in favor of the moving party. *See Baja Contractors, Inc. v. City of Chicago,* 830 F.2d 667, 674–75 (7th Cir. 1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988); *Roland Machinery Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 388–89 (7th Cir.1984); *Hancock Indus.,* 619 F.Supp. at 326. Furthermore, when a court is asked to enjoin the application of a statute because it is unconstitutional, the moving party must overcome the strong presumption that a statute is constitutional. *See Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 2578, 101 L.Ed.2d 520 (1988); *Hines v. Elkhart Gen. Hosp.,* 465 F.Supp. 421 (N.D.Ind.), *aff'd,* 603 F.2d 646 (7th Cir.1979); *cf. Eddy v. McGinnis,* 523 N.E.2d 737 (Ind.1988) (every enactment by the state legislature that is challenged before the Indiana Supreme Court is presumed to be constitutional).

■ To prevail on a motion for a preliminary injunction, the moving party bears the burden of establishing five requirements: (1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest. *Baja Contractors, Inc.,* 830 F.2d at 675; *Roland Machinery Co.,* 749 F.2d at 386–88.

As discussed above, this statute imposes essentially three new requirements on the business of hauling waste: a new tipping fee schedule; a requirement that the hauler certify the source of the "largest part" of the waste; and a requirement that a hauler of out-of-state waste obtain a certification from an officer in the source state who is responsible for that state's public health or environment stating that such waste is not hazardous under federal law or infectious under Indiana law. This court will address each of these new statutory provisions in determining whether the plaintiffs have met the five requirements for a preliminary injunction as set forth above.

A. Fees Provision

■ On plaintiffs' challenge to the first statutory provision—the tipping fee provision, as found in Ind.Code § 13-9.5-5-1—I do not even need to engage in the extensive five part test outlined above. Plaintiffs have not demonstrated an irreparable injury resulting from the threatened tipping fee provision.

As noted under the discussion of ripeness, the plaintiffs could face immediate and irreparable harm as a result of the threatened imposition of future tipping fees. They may hesitate to enter into business arrangements today that involve the shipment of solid waste into Indiana after January 1, 1991 (the date the state of Indiana begins collecting the fees). While this sort of injury is possible, plaintiffs have failed to meet their burden of proof under the preliminary injunction standard. Plaintiffs have not presented any evidence that demonstrates a current need to plan shipments of solid waste to be made in 1991. Mr. Thall did assert at the hearing that the plaintiffs were currently arranging for the shipment of solid waste into

1991, but there is no evidence of this fact before me. The closest the plaintiffs come to proving this fact is in the affidavit of Jack Castenova, who states, "Given the fee requirements imposed by the statute, it will be impossible for me to ever use Indiana landfills again. It will drastically affect my overall business." Affidavit of Jack Castenova, at ¶ 9, p. 2. This statement is not a strong enough factual showing of irreparable and immediate harm to justify a preliminary injunction. Even if the plaintiffs are currently planning (or being prevented from planning) 1991 shipments of solid waste into the state, there has been absolutely no showing that the plaintiffs cannot simply postpone this planning until this court can render a decision on the merits. Without more compelling evidence, I cannot grant a preliminary injunction.

Related to this conclusion, I find that the plaintiffs have also failed to show how the granting of a preliminary injunction against the prospective enforcement of the tipping fee provision could possibly prevent the harm that plaintiffs fear. Plaintiffs assert, without proof, that the threatened tipping fee provision makes it impossible for them currently to schedule waste shipments after 1990. Even if the plaintiffs had presented weighty proof of this present injury, they have not shown, indeed they cannot show, that this injury could be prevented by preliminarily enjoining the fees collection. I do not see how granting today a short-lived preliminary injunction on the fee collection provision could possibly prevent the harm that plaintiffs fear. If the plaintiffs are today planning shipments to be made in January 1991 and are being injured by the prospect of having to pay exorbitant tipping fees if they arrange to dump in Indiana, then a preliminary injunction which serves only to maintain the status quo until a full trial on the merits can be held will do nothing to remedy the plaintiffs' injuries. They must still make a business decision today that ultimately depends not on the outcome of their motion for a preliminary injunction but on the outcome of the trial on the merits. In other words, my decision on the preliminary injunction does not guarantee plaintiffs that come January 1991 Indiana will not be allowed to charge the tipping fee. By that time, the trial on the merits will have been concluded and the preliminary injunction will have been removed—replaced with either a permanent injunction or a decision that the tipping fee is constitutionally permissible. Although plaintiffs seek a preliminary injunction on grounds that their current ability to plan future business is being impaired, what they really need is a rapid determination of the merits of their claim (which is being accommodated by an expedited trial schedule).

Accordingly, the motion for a preliminary injunction against the prospective enforcement of the tipping fee provision is DENIED.

### B. Hauler Certification

■ The plaintiffs next challenge the hauler certification provision set forth at Ind.Code § 13–7–22–2.7(c)(1). This provision is currently in effect, and thus, this court will discuss in detail whether the plaintiffs have met the preliminary injunction requirements regarding the hauler certification.

#### i. *No Adequate Remedy at Law*

The plaintiffs must show that they have no adequate remedy at law, which is a precondition to any form of equitable relief. The ultimate relief sought by the plaintiffs in this case is a declaratory judgment decreeing certain provisions of the state statute unconstitutional and directing that the defendants be refrained from enforcing those provisions. The plaintiffs do not seek money damages and, indeed, are barred from recovering damages from the state due to the doctrine of sovereign immunity and the eleventh amendment to the Constitution. *See Chicago Stadium Corp. v. Indiana,* 123 F.Supp. 783 (S.D.Ind.1954); *Bracht v. Conservation Comm'n,* 118 Ind. App. 77, 76 N.E.2d 848 (1948). Thus, the plaintiffs have no adequate remedy at law.

#### ii. *Irreparable Harm*

The requirement of irreparable harm is needed in cases, such as this, where the

ultimate relief sought by the moving parties is equitable, implying that they have no adequate remedy at law. Only if the moving party will suffer harm before trial that cannot be prevented or fully redressed by a final judgment can the party get a preliminary injunction.[6] Thus, the plaintiffs can get a preliminary injunction only if they will suffer irreparable harm before the final judgment after trial. *Roland Machinery Co.*, 749 F.2d at 386. The plaintiffs provide affidavits in which they allege that they will suffer a substantial loss of business. The affidavit of John J. Lynch, Vice President of plaintiff Government Suppliers Consolidating Services, Inc., states that seventy-five percent of Government Suppliers' revenue is derived from the shipment of solid waste to four Indiana landfills. Government Suppliers also deposits solid waste in landfills located in Ohio, Kentucky, Illinois, and Virginia. This waste is picked up from approximately thirty transfer or recycling stations in Eastern Pennsylvania, New York City and New Jersey. The affidavit of Jack Castenova, President of Jack Castenova, Inc., states that approximately fifty percent of his company's total volume of business is derived from the shipment of solid waste to five Indiana landfills. Jack Castenova does not state whether his company picks up all or some portion of the trash from transfer stations, nor does he state to what extent his company deposits solid waste in other states' landfills.

This court finds that the plaintiffs will suffer some irreparable economic harm due to the disruption of their businesses, but the magnitude of that harm as measured in actual dollar amounts remains uncertain. Lynch states that the charges of the landfills in Eastern Pennsylvania, New York City and New Jersey are so high that if his company had to pay those charges, Government Suppliers would go out of business. However, Government Suppliers admittedly has access to and currently uses other Midwestern landfills. While there is no evidence as to the cost of depositing waste in those landfills, it is reasonable to presume that it is a lesser cost than that imposed by those landfills closest to the transfer stations and possibly competitive with the costs currently charged by Indiana landfills. Government Suppliers has not shown that it cannot arrange to deposit the waste normally earmarked for Indiana, for example, in Ohio or Kentucky landfills, nor has it shown what those landfills charge in comparison to the charge imposed by Indiana landfills.

Similarly, it is not clear from Jack Castenova's affidavit to what degree Castenova, Inc. will suffer irreparable harm. For example, Jack Castenova does not state the percentage of the waste that his company picks up from transfer or recycling stations. If some of the waste is picked up from the actual point of origination as opposed to a transfer station that collects waste from various locales, then the hauler can more easily identify the point of origin and, thus, comply with even the strictest reading of the hauler certification requirement. It is also unclear whether Castenova, Inc. does business with or has access to other Midwestern landfills that may be competitively priced with Indiana landfills. To the extent that the Constitution may protect the haulers' ability to access Indiana landfills, a present deprivation of their constitutional rights exists. Thus, they have shown irreparable harm regardless of whether they have suffered economic loss. Even if they have suffered a violation of only their constitutional rights, they still have suffered a harm. *Milwaukee Co. Pavers Ass'n v. Fiedler*, 707 F.Supp. 1016, 1031–32 (W.D.Wis.1989), *modified on other grounds*, 710 F.Supp. 1532 (W.D.Wis. 1989).

### iii. *Balancing of Harms and Public Interest*

Having found that the plaintiffs will suffer some irreparable economic harm as well as a possible violation of their constitution-

---

**6.** When the moving party seeks only damages, the requirements of irreparable harm and no adequate remedy at law merge into one. When merger occurs, the question becomes whether the plaintiff will be made whole if he or she prevails on the merits and is awarded damages. *Roland Machinery Co.*, 749 F.2d at 386.

al rights, this court must weigh that harm against any irreparable harm that the defendants will suffer if the injunction is granted. According to the plaintiffs' affidavits, they will suffer a loss of business, but as this court has stated, the magnitude of that business loss is still in question. On the other side of the scale is the state's interest in tracking the origin of waste in order to monitor from where it is coming. Of course, this court must also insert into the weighing process the fifth preliminary injunction requirement—the public interest—which is, at least in a narrow sense, represented by the defendants. However, the scale may be tipped either way depending on whether "the public" is defined narrowly or expansively. Of course, "the public" in Indiana has a real concern with the problems that may occur with the dumping of unmonitored waste. The depositing of untreated infectious materials in landfills is a growing problem.[7] However, the broader "public," i.e., citizens all over the United States, have an interest in dealing with this severe national problem. As mentioned at the beginning of this entry, the "not in my back yard" or "NIMBY" attitude does not lead to a reasoned and constitutionally sound solution to this complex problem. *See Swin Resource Sys. Inc.*, 883 F.2d at 253 n. 3. A broader perspective is necessary and appropriate.

The plaintiffs may still be able to comply with the hauler certification if they can identify the state in which the trash originated, or if they can certify in which state the hauler picked up the trash at a transfer station (as will be discussed below there is some doubt as to the meaning of the word "generated"). In the event they can do neither, they may still be able to alleviate their economic loss by depositing the waste in another Midwestern landfill. There simply was not enough information on the record to show that the plaintiffs would suffer such a great loss of business that it would cripple their operations. Furthermore, the loss to the plaintiffs' businesses should be short-lived since the trial on the merits is scheduled to begin less than three weeks from the date of this entry. This is balanced against the apparent problem of monitoring the origin of the waste. However, whether the state is able to track the origin of the waste over the next three weeks is not crucial to the ultimate implementation of the statute, if it is determined to be constitutional. In this case, this court finds that the balancing of the harms is very close, but tips slightly in favor of the plaintiffs.

iv. *Likelihood of Success on the Merits*

This court must determine next whether the plaintiffs have a reasonable likelihood of prevailing on the merits against the defendants. The plaintiffs attack the statute on three constitutional fronts: the commerce clause,[8] the equal protection clause,[9] and the due process clause.[10] The parties seem to agree that the pivotal focus is the commerce clause, so the court will address that issue first.

The commerce clause is silent as to how much power a state retains to regulate economic activities within its borders that may have an impact on the national economy. However, the commerce clause, which essentially federalized the regulation of interstate commerce, stands in stark contrast to the desires of the Founders to preserve the independent power of the states over their internal affairs. The United States Supreme Court, in discussing the commerce clause's effect on a state's power to regulate, has stated as follows:

> [T]his Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution.
>
> . . . .
>
> This principle that our economic unit is the Nation, which alone has the gamut of

---

7. See the affidavit of Charles A. Haughs, exhibit C to the defendants' Supplemental Memorandum in Opposition to Application for Temporary Restraining Order, in which he describes finding infectious medical waste at one Indiana landfill.

8. U.S. Const. art. I, § 8, cl. 3.

9. U.S. Const. amend. XIV, § 1.

10. U.S. Const. amend. XIV, § 1; *see supra* note 1.

powers necessary to control ... the economy ... has as its corollary that the states are not separable economic units.
....

The material success that has come to inhabitants of the states which make up this federal free trade unit has been the most impressive in the history of commerce, but the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions.

*H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535, 537–38, 69 S.Ct. 657, 663, 665, 93 L.Ed. 865 (1949).

■■ Nonetheless, the states retain some authority under their general police powers to regulate matters of legitimate local interest, even though interstate commerce may be affected. *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). It is in this context of a national economy that courts must strike the balance between local and national concerns.

The plaintiff relies on the case of *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), in which New Jersey banned, with limited exceptions, the importation of out-of-state waste in order to protect New Jersey's environment and the health of its citizens. First, the Supreme Court held that the interstate movement of waste is "commerce" within the meaning of the commerce clause. *Id.* at 621, 98 S.Ct. at 2534. Second, the Court held that such out-of-state waste may not be discriminated against unless there is some reason, apart from its origin, to treat it differently and that the New Jersey statute violated this principle of nondiscrimination both on its face and in its effect. *Id.* at 626–27, 98 S.Ct. at 2536–37.

The inquiry that this court must make is whether Indiana's statute is "basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.* at 624, 98 S.Ct. at 2536. If the statute is simply economic protectionism, then it is per se invalid, regardless of whether the statute is enacted to regulate a matter of legitimate public concern. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981); *City of Philadelphia*, 437 U.S. at 627, 98 S.Ct. at 2537 ("[T]he evil of protectionism can reside in legislative means as well as legislative ends."). If the statute is neutral on its face and other legislative objectives are advanced, then the general rule set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) applies:

Where the statute regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

The hauler certification provision of the statute reads as follows:

Upon transporting solid waste in a vehicle to a final disposal facility (as defined in IC 13–9.5–1–14) in Indiana for disposal, the operator of the vehicle shall present to the owner or operator of the facility:

(1) a written statement in which the vehicle operator certifies, under oath or affirmation and subject to the penalty for perjury under IC 35–44–2–1, the:

(A) county in Indiana; or

(B) the state, if a state other than Indiana; in which the largest part of the solid waste was generated....

Ind.Code § 13–7–22–2.7(c).

On its face, this portion of the statute is neutral regarding its treatment of in-state versus out-of-state haulers because all haulers must certify as to where the "largest part of the solid waste was generated."

Thus, it appears that the constitutionality of this portion of the statute will have to be determined under the *Pike* approach set forth above. The state asserts that it has a legitimate interest in protecting human health and the environment through the regulation of hazardous and infectious medical waste. As evidence of this interest, the defendants submitted an affidavit from an investigator for the Indiana State Board of Health stating that at least one person received puncture wounds and lacerations from climbing over large bales of improperly treated infectious medical waste and sharp objects that were in out-of-state trucks. The plaintiffs, on the other hand, assert that while the state does have a legitimate interest in protecting its citizens from hazardous and infectious waste, this goal could be reached with a lesser impact on interstate commerce. For example, the hauler certification requirement might serve as "census" or a "tracking" mechanism so that the state could assess the amount of out-of-state waste that is deposited in Indiana landfills. However, this purpose could be met by requiring the haulers to certify from which state or transfer station the waste was picked up, as opposed to requiring the haulers to know from where the waste originated. This would lessen the risk of a charge of perjury against those haulers who simply do not, or cannot, know from where the waste was generated.

As to the challenge to the hauler certification, it appears that the plaintiffs have some likelihood of success on the merits via the commerce clause. Thus, the court will also address the likelihood of success on the other two constitutional theories that the plaintiffs raise.

The plaintiffs raise an equal protection claim because "the distinctions are drawn without a rational basis, other than the constitutionally infirm desire to halt solid waste at Indiana's borders." However, the hauler certification requirement does not treat in-state and out-of-state haulers any differently. In-state waste must be identified by the county from which it came; out-of-state waste must be identified by the state from which it came. Thus, this argument appears to be weak with respect to this portion of the statute.

Finally, the plaintiffs attack the hauler certification requirement as being unconstitutionally vague in violation of the due process clause.[11] The plaintiffs suggest that this provision is vague in the following ways: (1) the requirement that a hauler certify, under penalty of perjury, which state or county "generated" the "largest part" of his or her load fails to specify whether "generated" means the place where the waste was picked up by the hauler or the place where the waste originated, Ind.Code § 13–7–22–2.7; and (2) this same law does not specify whether "largest portion" is determined by weight or volume.[12]

The concept of unconstitutional vagueness is supported by the dual concerns that all laws ought to provide fair warning to those who risk acting in violation of the law, and ought to provide explicit standards to those who enforce the law so that the law will not be enforced in an arbitrary and discriminatory manner. (These concerns are commonly referred to as the concerns of "fair notice and fair enforcement.")

With respect to fair notice, the due process clause requires that a law give all persons sufficient warning so that they may conduct themselves so as to avoid that which is forbidden. Statutes need not avoid *all* vagueness, however, since all statutes are written with words, and "in most English words and phrases there lurk uncertainties." *Robinson v. United States*, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944 (1945) (vagueness under the fifth amendment). One test often used to detect unconstitutional vagueness is termed the "common intelligence standard." A stat-

**11.** *See supra* note 1.

**12.** Although Ind.Code § 13–7–22–2.7(c)(1) does not specify whether "largest part" refers to volume or weight, Ind.Code §§ 13–9.5–11–1 & –2 refer to volume. These sections impose record keeping and quarterly reporting requirements on haulers.

ute will fail this test for vagueness if "[persons] of common intelligence must necessarily guess at its meaning." *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

The degree of vagueness tolerated by the Constitution will vary depending on several factors. Economic regulations are examined less carefully since the subject matter regulated is more narrow and because business can be expected to consult relevant legislation in advance of action. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). Laws that impose civil sanctions are reviewed less strenuously than laws that impose criminal sanctions. *Id.* In addition, laws that threaten to inhibit the exercise of constitutionally protected rights are subjected to greater scrutiny. *Id.* Finally, courts have acknowledged that a scienter requirement may mitigate a law's vagueness. *Id.*

Applying these vagueness standards to the hauler certification requirement, there is only a negligible chance the provision would be struck down on vagueness grounds. Since the provision regulates only economic activity, it will not be subjected to overly strenuous scrutiny. However, because the state has chosen to impose the penalty of perjury on haulers who make out false certifications, Ind.Code § 35–44–2–1, the statute will be scrutinized more strenuously than if it had imposed only civil penalties.

Even though the risk of criminal prosecution will compel this court to look carefully at the statute's vagueness, the scienter requirement contained within the perjury statute will mitigate the law's vagueness. However, as plaintiffs' counsel pointed out at the hearing, the scienter element for a perjury conviction requires the perjurer to make the false statement "knowing the statement to be false *or* not believing it to be true." Ind.Code § 35–44–2–1 (emphasis added). Plaintiffs' counsel asserted that the second prong of the scienter requirement would be easier to prove than the first prong, and that none of the haulers

coming from out of state could sign a certification without committing perjury under this lowered standard. This assertion was made, however, based on the assumption that the statute required the hauler to certify the state from which the solid waste originated, and not the state from which the hauler brought the trash. As discussed below, this assumption may not be correct.

Looking first at the plaintiffs' claim that the word "generated" in the statute is unconstitutionally vague, I do not believe that the word is so vague as to render the provision unconstitutional. Admittedly, the word is susceptible of two interpretations— the point of origination and the point at which the hauler picked up the solid waste. Whenever a statute is susceptible of two interpretations, it is a basic rule of statutory interpretation that courts are to interpret statutes in such a way as to avoid constitutional questions. " '[W]hen one admissible construction will preserve a statute from unconstitutionality and another will condemn it, the former is favored even if language, ... and arguably the legislative history point somewhat more strongly in another way.' " *The Rail Reorganization Act Cases*, 419 U.S. at 134, 95 S.Ct. at 354 (quoting lower court opinion). Reading "generated" to mean "point of origination" would subject the statute to attack as being an unconstitutional interference with interstate commerce. If it is true that few haulers importing solid waste into the state can truthfully certify as to the trash's point of origination because of the prevalent use of transfer stations in the interstate shipment of solid waste, then reading "generated" to mean "point of origination" could destroy the statute's otherwise evenhanded approach to the regulation of solid waste and might create a substantial constitutional question based on the commerce clause. This constitutional question could be more easily avoided by applying the second reading to the statute, i.e. that the hauler is required only to certify the point at which the trash was picked up. Since such a reading of the statute would maintain the evenhandedness of the statute, the risk

that the statute would be unconstitutional would be substantially lessened.[13]

Turning next to the plaintiffs' claim that the phrase "largest part" is unconstitutionally vague, I also do not believe that this alleged ambiguity should render the statute unconstitutional. I have already noted that the term "largest part" was defined to mean volume within another statutory provision included in the legislative package. Unless plaintiffs come forward with some evidence or statutory analysis of the language of this statute as a whole to show that these two provisions were not meant to be read in a similar fashion, I see no reason why the phrase "largest part" should be given a meaning different from that given the term in another part of the same statutory package. With this interpretation fairly clear, I believe I would be stretching the law of vagueness to strike down the statute simply because the legislature failed to define the term every time it used it.

I should emphasize that the above paragraphs are simply my preliminary interpretations of this language, done without even the benefit of a copy of the Enrolled Act. I have been asked to consider the plaintiffs' "likelihood of success on the merits" of its claim that the statute is unconstitutionally vague. I am not deciding the merits of the due process claim, but am simply putting forward the arguments that frame the issue. With that said, it is apparent that the plaintiffs have little likelihood of succeeding on its claim that the hauler certification requirement is unconstitutionally vague.

Returning to the plaintiffs' overall "likelihood of success," the plaintiffs need to show only that they have some likelihood of succeeding on the merits. It is enough that their chances " 'are better than negligible....' " *Roland Machinery Co.*, 749 F.2d at 387 (quoting *Omega Satellite Prods. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)). At this point

in the record and based upon the above discussion on the likelihood of success as to each of the plaintiffs' three constitutional theories, this court finds that the plaintiffs have shown more than a negligible chance of winning on the merits as to the constitutionality of the haulers certification, although the showing is not as strong as the showing with regards to the official certification, as will be discussed in the next section. Certainly the showing at this point does not foreshadow certain victory for the plaintiffs.

With regard to the hauler certification only, this court finds that the plaintiffs have not made a strong showing of a likelihood of winning on the merits, nor have they shown that the balance of harms weighs so heavily in their favor as to counterbalance their likelihood of success. *See Roland Machinery Co.*, 749 F.2d at 387 ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.").

The Seventh Circuit has counselled as follows:

[T]he district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances. That cost is a function of the gravity of the error if it occurs and the probability that it will occur.

*Roland Machinery Co.*, 749 F.2d at 388.

In light of the presumption of constitutionality, the determination that the harms are closely balanced and the determination that the plaintiffs' likelihood of success is slightly more than negligible, I conclude

---

**13.** Although the defendants do not raise *Pullman* abstention, I feel obligated to point out that this specific constitutional attack on this specific statutory provision appears to fall within this class of cases. A federal court has been asked to resolve a constitutional challenge to a state statute when a state court interpretation of an ambiguous word or phrase within the statute could eliminate the need for the federal court to resolve the constitutional question. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

that the disruption of the state's tracking of the origination of waste deposited in Indiana landfills, if this court did issue a preliminary injunction, would be a more costly error than the risk to the plaintiffs of losing an undisclosed amount of business profits over the next three weeks if the injunction is not issued. Thus, this court DENIES plaintiffs' motion for a preliminary injunction against that portion of the statute that requires haulers to certify from where the largest part of the solid waste was generated.

## C. Health Officer Certification

■ The text of the "health officer" certification provision is set forth below:

> Upon transporting solid waste in a vehicle to a final disposal facility (as defined in IC 13–9.5–1–14) in Indiana for disposal, the operator of the vehicle shall present to the owner or operator of the facility:
>
> ....
>
> (2) if the largest part of the solid waste was generated in a state other than Indiana, a document in which an officer of a state or local government who has responsibility in that other state for the protection of public health or the environment certifies that the part of the solid waste generated in that state is not subject to regulation as hazardous waste under the federal Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or as infectious waste under IC 16–2–9.7.

Ind.Code § 13–7–22–2.7(c).

The plaintiffs, of course, have the burden of meeting the five requirements in order to obtain a preliminary injunction as to the health officer certification. However, the determinations on several of the require-

ments do not vary. The plaintiffs have already shown that they have no adequate remedy at law and that they would be irreparably harmed if the injunction is not granted. Therefore, this court will start with an analysis of whether the plaintiffs have met the third requirement for obtaining a preliminary injunction—the balancing of harms.

As stated above, the plaintiffs will suffer an undetermined amount of irreparable harm to their businesses. This court must balance this against the harm to the state if an injunction is issued. The state has a legitimate interest in protecting the public and the environment from hazardous and infectious waste by ensuring compliance with federal and state legislation. *See* 42 U.S.C. §§ 6901–6992k [14]; Ind.Code §§ 16–1–9.7–1 to 16–1–9.7–8. If the health officer certification is preliminarily enjoined until the conclusion of the trial, then the state argues that it, i.e., the local public, will risk exposure to out-of-state hazardous and infectious waste. The defendants do not provide any evidence for this court to find that there is a likely risk to Indiana residents of exposure to hazardous waste that is not in compliance with federal regulation. The defendants do provide the affidavit from Charles A. Haughs who found, through his investigation of Indiana landfills for the Indiana State Board of Health, that improperly treated infectious medical waste was being deposited in such landfills by out-of-state haulers. Again, given the short time until the trial, it does not seem very likely that the depositing of such medical wastes will result in the infection or injury to an Indiana resident. While the harm may indeed be irreparable, the risk that it will occur on a widespread basis in a short amount of time is small.[15]

**14.** Indiana's statute requires that the official from the state where the waste originated certify that such waste is not hazardous waste under the federal Solid Waste Disposal Act. This Act also provides for the regulation of medical wastes under a "demonstration program," which is funded for fiscal years 1989 through 1991. 42 U.S.C. §§ 6992–6992k. This program provides, in part, for the tracking of medical waste from its point of origin to disposal and the segregation and placement of such waste in labeled, safe containers. 42 U.S.C. § 6992b. Indiana was one of the states covered under the federal program, though there are provisions that allow a state to opt out. 42 U.S.C. § 6992. The record in this case does not disclose whether Indiana is or is not a participant in this medical waste tracking program.

**15.** See this court's earlier discussion on the broader public's interest in the efficient solution

The plaintiffs make a very strong showing of likelihood of success on the merits regarding the health officer certification. Again, the commerce clause requires this court to inquire whether Indiana's statute is "basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2536. While the hauler certification appears to be even-handed in its treatment of in-state and out-of-state haulers, the health officer certification clearly treats in-state and out-of-state haulers differently. The defendants assert that they have to require more strict requirements for the importation of out-of-state waste in order to ensure the safety of the public and the environment, but this could be accomplished in a way that is more efficient and less burdensome to interstate commerce.[16] As the plaintiffs allege, this requirement looks more like a protectionist measure intended to stop totally the importation of out-of-state trash into Indiana. If this is the case, then the statute is invalid under the commerce clause. *Id.* at 624, 98 S.Ct. at 2535.

The plaintiff's due process vagueness argument also looks strong. The statute requires that an out-of-state hauler must present a "document" from a "state or local government officer with public health or environment responsibilities" which "certifies" that "the part of the solid waste generated in that state is not subject to regulation as hazardous waste under the federal Solid Waste Disposal Act (42 U.S.C.

§ 6901 *et seq.*) or as infectious waste under Ind.Code 16-1-9.7." Ind.Code § 13-7-22-2.7(c)(2). Apparently, none of these terms are defined within the statute, and one is left to speculate as to their meaning. This fails to identify which state's health officer must certify the document and which health officer within that state must provide the certification. Furthermore, the statute fails to specify how the hauler can force the foreign health officer to make such a certification.

Finally, the plaintiffs' equal protection claim also looks strong because the arguments under this provision parallel or are subsumed under the commerce clause claim, which is addressed above.

Thus, with regard to the health officer certification only, this court finds that the plaintiffs have met all of the requirements for a preliminary injunction and have a strong likelihood of succeeding on the merits. As the Seventh Circuit has stated, "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor...." *Roland Machinery Co.*, 749 F.2d at 387. Applying this "sliding scale" approach, this court further finds that the plaintiffs have made such a strong showing of succeeding on the merits that the portion of the statute that requires a health officer certification to be obtained by out-of-state waste haulers should be preliminarily enjoined. *See Roland Machinery Co.*, 749 F.2d at 387–88.

### III. Conclusion

Based on the aforementioned reasons, this court will GRANT IN PART the plain-

---

to the national problem of waste disposal. *Supra* at 855 & 864–65.

**16.** Defendants cite to *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), and other quarantine cases that upheld bans on the importation of articles such as diseased bait fish and livestock. Thus far the plaintiffs have not presented any evidence to bring this case within the scope of these quarantine cases. First, many of these cases were decided by the Supreme Court long ago when the interstate shipment of "bad" things was *not* considered interstate commerce. *City of Philadelphia* changed the playing field by holding that solid waste is commerce for purposes of the commerce clause.

437 U.S. at 621, 98 S.Ct. at 2534; *see also Illinois v. General Elec. Co.*, 683 F.2d 206, 214 (7th Cir.1982) ("the 'quarantine cases' on which the state heavily relies, treat interstate commerce in 'bads' as not commerce at all."). Second, in *Maine v. Taylor*, one of the most recent quarantine cases, Maine's ban on the importation of diseased bait fish was upheld by the Supreme Court because the problem with infected bait fish, for the most part, did not exist within the state of Maine, and thus, the transportation of the fish threatened to spread the disease to an uninfected area. Here, Indiana does not claim that its citizens do not generate their own hazardous or infectious waste, which, if untreated, is as dangerous as the imported waste.

tiffs' motion for preliminary injunction as to that portion of the state statute, Ind. Code §§ 13–7–22–2.7(c)(2), (e), (g) & (h), that requires a health officer certification before a hauler may deposit out-of-state solid waste in an Indiana landfill. The preliminary injunction is DENIED as to all other provisions of the statutes.

Whenever a court issues a preliminary injunction, the party seeking the injunction is normally required to post a bond with the court, pursuant to Federal Rule of Civil Procedure 65(c):

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Although case law has somewhat weakened the mandatory language used in Rule 65(c), *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 54 (7th Cir. 1980), especially when the party seeking the injunction alleges a constitutional deprivation, *Milwaukee Co. Pavers Ass'n v. Fiedler*, 707 F.Supp. at 1034, a district court should not waive the bond requirement without first having the parties address the subject. Neither party raised the issue at the preliminary injunction hearing. Thus, I am directing the parties to submit briefs and evidentiary material to this court on the question whether a bond should be required and what the amount of the bond should be. The briefing schedule is set out in this court's accompanying order.

## ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

This matter comes before the court on the plaintiffs' motion for a preliminary injunction. The issues have been fully briefed by the parties, and evidence and argument have been heard on this matter. A memorandum entry of this same date has been issued containing the reasoning of this court in support of this order.

IT IS NOW ORDERED, ADJUDGED AND DECREED that from April 3, 1990 until a final judgment is issued after the trial of this case, or further order of the court, the defendants are preliminarily enjoined from enforcing Indiana Code §§ 13–7–22–2.7(c)(2) and (e), which provisions relate to the "health officer" certification requirement, and Indiana Code §§ 13–7–22–2.7(g) & (h) to the extent that these subsections depend upon or enforce Ind.Code §§ 13–7–22–2.7(c)(2) and (e). In all other respects, the motion is DENIED.

### BOND

Pursuant to Fed.R.Civ.P. 65(c), the plaintiffs may be required to post a bond in an amount to be determined by the court after the parties have had an opportunity to brief the issue. Plaintiffs are to submit to the court a brief addressing the legal and factual issues relevant to the setting of a bond in this case by the close of business Thursday, April 5, 1990. Defendants are to submit to the court a responsive brief by the close of business Monday, April 9, 1990. Plaintiffs are to submit to the court a reply brief by the close of business Tuesday, April 10, 1990. While the preliminary injunction is immediately effective, this court will dissolve the injunction if plaintiffs fail to comply with this court's subsequent orders regarding the posting of a bond.

ALL OF WHICH IS ORDERED this third day of April 1990.